## SILLIMAN *v.* UNITED STATES.

## UNITED STATES *v.* SILLIMAN.

A., the owner of certain barges, executed charter-parties of them to the United States for a stipulated sum per month so long as they should be retained in the service. After they had been for some time used, he was informed by the Quartermaster-General that he must execute a new charter-party specifying a reduced compensation. A. declined to comply, and made a demand for them, which was refused. On learning the intention of that officer to retain possession of them and withold all compensation, A. executed the required charter-party, stating at the time that he did so under protest and by reason of the pressure of financial necessity. He thereafter, from time to time, received, without protest or objection, payment according to the diminished rate, and then brought suit against the United States for the difference between it and the original rate, upon the ground that the last charter-party was executed under such circumstances as amounted in law to duress. *Held*, that A. is not entitled to recover.

APPEALS from the Court of Claims.

The case as set forth in the findings of fact is this: —

In 1863, claimants were partners in trade, doing business in the city of New York, under the firm style of Silliman, Matthews, & Co. At various times they executed with the United States (the latter represented by Major Van Vliet of the quartermaster's department) several charter-parties for barges of which they were owners. The barges were delivered to the quartermaster's department, and remained in service during the periods respectively set forth in the petition. The claimants were paid at the charter rates up to and including the 31st of October, 1863.

On the 2d of June, 1863, the Quartermaster-General, by letter, instructed Quartermaster Van Vliet that all double-decked barges then in service and used for transporting cattle, horses, &c., should, from and after the 1st of that month, be made to conform to a standard of compensation at rates not to exceed four dollars per ton per month.

The owners of the barges, being notified by Major Van Vliet of the Quartermaster-General's instructions, replied that their barges were only measured as single-deck, and that the rate

of four dollars per ton per month would not pay them unless they were allowed to measure the upper deck also, and that rather than accept the reduction they preferred to have their boats discharged.

This reply of the claimants having been communicated to the Quartermaster-General, he directed Major Van Vliet to discharge the barges from service as rapidly as he could procure others upon the terms just stated, and under a new form of charter-party prescribed by the Quartermaster-General.

In reply to this direction Major Van Vliet, on the 22d of July, 1863, informed the Quartermaster-General that it was impossible to obtain barges at New York at the rates indicated by the latter, taking the registered tonnage as the standard of measurement, which represented only their hold-measurement, and not their actual carrying capacity; and that compensation at the rate of four dollars per ton of actual carrying capacity would exceed that stipulated for in the then existing charter-parties.

From July 22, 1863, till December, 1863, no further correspondence took place in regard to the barges, and they remained in the service as before.

On the 10th of December, 1863, the Quartermaster-General instructed Major Van Vliet that the double-decked barges chartered by the latter must be brought within the price stated in the letter of June 2, 1863, and that no higher rate would be allowed for them from and after Dec. 1, 1863.

This instruction having been communicated by Major Van Vliet to the claimants, the latter, on the 14th of December, having before them the form of the new charter-party which had been proposed by the Quartermaster-General, stated to Major Van Vliet, by letter, that rather than sign the new charter-party they had decided to have their barges returned to them, and that they would not let them for four dollars per ton per month.

On the 28th of December, 1863, the Quartermaster-General issued a circular-letter to several quartermasters, and assistant quartermasters, among whom was Major Van Vliet, stating that no payments would be made for charter-money for services

rendered and due after March 31, 1863, under any other form of charter-party than that which had, on the last-named date, been prescribed by the Quartermaster-General.

After the date of the last-mentioned letter, one of the claimants, Silliman, went to Washington and demanded of the Quartermaster-General the return of the barges to the claimants at New York. That officer replied that the government could not spare them; and when Silliman remonstrated with him against their retention by the government, the Quartermaster-General said the government needed the barges and would keep them, and he declined to pay the arrears then due the claimants for their services under the original charter-parties. Thereafter the claimants made repeated calls on Major Van Vliet for arrearages of money, and were informed that he was ordered not to pay them any until they had made new charter-parties.

On the 8th of January, 1864, the claimants addressed a letter to the Secretary of War, complaining of the treatment they had received from officers under him, stating that two of them had gone to Washington and could find no person who would modify the new charter-party so that they might accept the terms that could be agreed upon, and adding the following words: —

"We now complain as follows, viz.: —

"1. That we have requested that our barges be returned to New York and delivered to us as per charter-party, and have been refused.

"2. That we have 'certificates of service' for November and December, 1863, and the quartermaster at New York has orders not to pay until we make new charters, and we refuse to make them as the blank charters dictate, but are willing to make some concession in price if any person can be named here to negotiate.

"3. We desire to sell, if we cannot have our barges or obtain money for their use, as we cannot meet our obligations to our captains and crews without money to do it, and hope you will act favorably for us at an early date."

On the 5th of March, 1864, the claimants wrote to the Quartermaster-General, proposing to accept the new charter-

parties from the first of the month nearest the acceptance of the same, with certain modifications.

These modifications were accepted by the Quartermaster-General on the 19th of March, 1864, with the exception of the date offered for their taking effect, which he required should be on the 1st of April, 1863.

On the 23d of March, 1864, the claimants, by letter to the Quartermaster-General, said as follows : —

"We have been paid to November 1, 1863, and if we have to go back to April 1, 1863, we shall have to stop payment, as we have depended on this money to keep along in our business. . . . We have been told by other parties that they dated new charters from December 1, and we can see no reason that they should be favored above us. . . . We cannot go back to April 1, 1863."

To this letter the Quartermaster-General replied, on the 11th of April, 1864, that all charter-parties, without exception, executed to take effect Dec. 1, 1863, for vessels in the service April 1, 1863, had been required to take effect from the latter date.

After this letter the claimant, Matthews, went to Washington and had interviews with the Quartermaster-General and other officers in his office, in which he again remonstrated, as had before been done by his partner, Silliman; to which the Quartermaster-General replied that they had laid down the rule and were determined that nothing else should be done until the new charter-parties had been executed; that until that was done they would keep the barges and not pay for them. Said Matthews, during his visit to Washington, finally agreed with Colonel Clary, an officer in the Quartermaster-General's office, to make the new charter-parties, stating that they did so under protest and yielded to necessity, and insisting, after he had agreed to make them, that it was wrong to make new charter-parties.

On the 16th of May, 1864, in pursuance of Matthews' agreement, the new charter-parties were signed by the claimants and an officer of the quartermaster's department.

The compensation therein stipulated to be paid after Oct. 31, 1863, was, from and after that date, from time to time, paid

to the claimants for each of the barges, and when each payment was made the claimants, without objection or protest, gave a receipt therefor as " in full of the above account."

The claimants, in their petition, assert claims against the United States for certain balances, computed upon the basis of the original charter-parties, after crediting the several sums received from time to time under the last agreements or charter-parties, which they claim to have been executed under compulsion, and not, therefore, binding upon them.

They also sue to recover damages alleged to have resulted from the use of the barges in a negligent and improper manner by the agents of the government, and for injuries done to them while in the government service, not attributable to ordinary wear and tear.

The Court of Claims held claimants bound by the terms of the charter-parties last executed, but allowed a portion of the damages claimed.

Both parties appealed from the judgment.

*Mr. Thomas J. Durant* and *Mr. Charles W. Hornor* for Silliman.

*The Attorney-General, contra.*

MR. JUSTICE HARLAN, after stating the facts, delivered the opinion of the court.

The barges in question were delivered by claimants to the government under the original charter-parties, binding the latter to pay for their use at an agreed rate, during such period as they were retained in its service. The government was as much bound by the terms of the contracts as were the claimants, and no alteration thereof could take place without the assent of both contracting parties.

The quartermaster's department demanded that the claimants should execute new charter-parties, containing stipulations essentially different as to compensation, from those embodied in the contracts under which the government obtained possession of the barges. It announced its purpose to retain possession, and withhold all compensation, unless and until the claimants executed the proposed new charter-parties. In other words, the department informed claimants that it would not

comply with the provisions of the original contracts unless the claimants would submit to material alterations against their interests and to the advantage of the government. Claimants distinctly refused to give their assent to the proposed alterations, and asked that the barges be returned. But this reasonable request was not complied with by the agents of the government. Their conduct was in plain violation of the rights of the claimants.

Had the claimants stood upon their contract rights it is perfectly clear that the government could have been compelled to pay the amount stipulated in the original contracts to be paid for the use of the barges. The claimants could have sued for each instalment of rent as it became due, or when the government returned the barges they could have sued, as they now sue, for the whole amount due under the original charter-parties. They had a full and complete remedy by suit against the government in the Court of Claims for the enforcement of their rights under those contracts. That court had then, as it has now, jurisdiction to hear and determine all claims founded upon contracts, express or implied, with the United States. Its final judgments, sustaining such claims, were then as now made payable out of any general appropriation by law for the satisfaction of private claims against the government.

Instead, however, of seeking the aid of the law, claimants, with a full knowledge of their legal rights, executed new charter-parties, and, from time to time, received payments according to the rates prescribed therein — protesting, when the new agreements were signed, that they were executed against their wishes and under the pressure of financial necessity. They now seek the aid of the law to enforce their rights under the original charter-parties, upon the ground that those last signed were executed under such circumstances as amounted, in law, to duress. Duress of, or in, what? Not of their persons, for there is no pretence that a refusal, on their part, to accede to the illegal demand of the quartermaster's department would have endangered their liberty or their personal security. There was no threat of injury to their persons or to their property, to avoid which it became necessary to execute new charter-parties. Nor were those charter-parties executed for the purpose, or as

a means of obtaining possession of their property. They yielded to the threat or demand of the department solely because they required, or supposed they required, money for the conduct of their business or to meet their pecuniary obligations to others. Their duty, if they expected to rely upon the law for protection, was to disregard the threat of the department, and apply to the courts for redress against its repudiation of a valid contract.

We are aware of no authority in the text-books or in the adjudged cases to justify us in holding that the last charter-parties were executed under duress. There is present no element of duress, in the legal acceptation of that word. The hardships of particular cases should not induce the courts to disregard the long-settled rules of law.

The case is one which in some aspects appeals strongly to the sense of justice of the government, which cannot afford to reap the fruits of an arbitrary abrogation by its officers, of valid, binding contracts made in its name with the citizen. If, in view of the condition of the country during the recent war, the claimants were unwilling to embarrass or imperil the operations of the government by contests in the courts as to property which, possibly, was needed by the military department for supplying the necessities of our army, these facts only strengthen their claim to relief. But that relief must come from the legislative, and not from the judicial department.

We perceive no error in the judgment, and it is, as to all parties,

*Affirmed.*