## DAUSCH, *Appellant*, v. CRANE.

### DIVISION ONE.

1. **Land**: DESCRIPTION IN DEED: JURY QUESTION.   Whether or not land in controversy is within a certain survey named in a deed is, the evidence being conflicting, a question for the jury.

2. **Deed**: AUTHORITY TO MAKE.   Where a deed is executed and delivered under authority of an act of the legislature, and a resolution of a board of aldermen passed pursuant to said act, a subsequent resolution of the board repudiating the deed, and reciting it was made without authority, will not affect its validity.

3. **Lease**: SURRENDER OF POSSESSION.   A lessor executed a writing whereby she released her tenant from the lease and surrendered possession to another person's lessee who had sublet the premises to her tenant, in consideration of her being released from all claims because of her having occupied and excavated the same. *Held*, that such instrument was in legal effect a surrender of the premises by her.

4. **Duress.**   A threatened lawsuit if the lessor did not sign said instrument constitutes no proof of duress.

5. **Adverse Possession.**   A party is not entitled to an instruction upon the acquisition of title by adverse possession, when possession was surrendered before the expiration of the statutory period.

6.   Lease: ATTORNMENT TO STRANGER. The attornment by a tenant to a stranger does not affect the possession of the landlord.

7.   Adverse Possession. Adverse possession with the owner's knowledge and acquiescence need not be open and notorious.

*Appeal from St. Louis City Circuit Court.*—HON. DANIEL DILLON Judge.

AFFIRMED.

*E. P. Johnson* and *R. F. Wingate* for appellant.

(1)   Sophia White had an unimpeachable record title to the premises in dispute.   (2)   She also had a clear title of adverse possession for twenty years.   (3) Instruction, numbered 5, asked by appellant, in regard to the execution of the Sophia White paper, should have been given, as it asserts a correct legal proposition, and there is ample testimony on which to base it, and which shows that Mrs. White's signature was obtained by at least moral duress sufficient to vitiate it. *Davis v. Luster,* 64 Mo. 43; *Maguire v. Savings Ass'n,* 62 Mo. 344; *Smith v. Paris,* 53 Mo. 274.   And it was also fraudulently obtained so as to vitiate it.   *Martin v. Bonsack,* 61 Mo. 557; *Mattison v. Ausmuss,* 50 Mo. 551; *Crispen v. Hannovan,* 50 Mo. 548; *Goff v. Roberts,* 72 Mo. 572; *Higgins v. Turner,* 61 Mo. 249; *Wright v. McPike,* 70 Mo. 175; *Allen v. Mansfield,* 82 Mo. 688; *Loring v. Harmon,* 84 Mo. 123.   (4)   Instruction, numbered 5, given for respondent, is erroneous and misleading in assuming, contrary to all of the testimony of both respondent and appellant, that Fritz Walkenhorst, under the instrument bearing his name, never surrendered the possession of the premises in dispute to Tiffany or those claiming under him, and that he attorned to Millard while he was Tiffany's tenant, and instructs the jury that if he built a fence around them

by direction of Millard under these circumstances, the fence and possession inured to the benefit of Tiffany and the Dillon estate.

*Lee & Ellis* for respondent.

(1) There was evidence that the property lies in the Mackay tract. (2) The deed was *prima facie* evidence that all prerequisites for exercise of the power had been complied with. *Wells v. Pressy,* 105 Mo. 164, 179, and cases there cited (3) The resolution of the board of aldermen of date April 2, 1836, authorized this deed. (4) There was no evidence which would constitute duress *per minas,* as to Mrs. White's document surrendering possession. *Murdock v. Lewis,* 26 Mo. App. 242; *Holmes v. Hill,* 19 Mo. 159; *Claflin v. McDonough,* 33 Mo. 412; *Davis v. Luster,* 64 Mo. 43; 9 Mo. App.; *Buchanan v. Sahlem,* 9 Mo. App. 552. (5) There was no evidence which would constitute duress of property. *Silliman v. United States,* 101 U. S. 470; *Hackley v. Headley,* 45 Mich. 43; *Skeate v. Beale,* 11 A. & E. 983; *Preston v. Boston,* 12 Pick. 14; *Miller v. Miller,* 68 Pa. St. 486; *Emmons v. Scudder,* 115 Mass. 372. (6) Nor does the evidence constitute a case for equitable relief, citing *arguendo: Dailey v. Jessup,* 72 Mo. 144; *Faust v. Birner,* 30 Mo. 414, 419. (7) The subsequent deed, twenty months later, recognizing defendant's title, barred all complaint as to duress. *Lyon v. Waldo,* 36 Mich. 345; *Bodine v. Morgan,* 37 N. J. Eq. 426; *Murdock v. Lewis,* 26 Mo. App. 242; *Davis v. Fox,* 59 Mo. 134. (8) There was no evidence to conflict with the date fixed *prima facie* by the recital of the deed. (9) The instructions as to the meaning of the paper were legal, consistent and adequate. (10) The instruction that Walkenhorst could not while tenant

surrender possession to Millard was correct. *Farrar v. Heinrich*, 86 Mo. 532. (11) With the other instructions it covered all the law on the point. (12) The instructions as to adverse possession in defendant were correct. (13) Appellant's instructions on this point removed all possibility of misunderstanding. (14) Appellant's instruction as to ten years' possession prior to February 22, 1857, was properly refused, because another instruction covered the point. (15) And because there was no evidence to support it. (16) There was no reason for granting an instruction as to the possibility of defendant's recovery for improvements in another suit. (17) The inventory of Mrs. White's estate was properly admitted as evidence on possession. (18) The burden of proof rested on plaintiff. (19) The instructions are to be considered as a whole. *Karle v. Railroad*, 55 Mo. 476; *Whalen v. Railroad*, 60 Mo. 323.

BLACK, J.—This is ejectment in which there was a verdict and judgment for defendant. The property sued for is described as fifty-five feet on St. Ange avenue extending back two hundred and sixteen feet to a width of fifty feet on Linn street, and bounded on the north by Park avenue, in the city of St. Louis. It is part of a triangular piece of ground containing one and twenty-hundredths acres, bounded on the north by Park avenue, west by St. Ange avenue, east by Linn street, and is known as city block 822. This city block is located in the northwest corner of block 2 of Charles DeWard's survey of the St. Louis commons.

By the act of March 18, 1835 (2 Ter. Laws, p. 501) the mayor and aldermen of the city of St. Louis were authorized to sell the commons belonging to the inhabitants of the city at public auction, the purchaser to pay interest annually until the expiration of ten

years, with the right to pay the principal at the end of that time and receive a deed in fee. This act also gives the mayor and aldermen power to settle and compromise with persons having claims within the commons, conflicting with the claim of the inhabitants.

The commons were laid off into blocks pursuant to this act by what is called the DeWard survey; and on the twenty-eighth of January, 1836, the city passed an ordinance for the sale of the commons, and in the same year provided by another ordinance that grantees or purchasers should have the right to be substituted in place of the original purchasers.

Besides the act of the legislature, the DeWard survey and these ordinances, the plaintiff introduced the following evidence: *First,* parol evidence tending to show that Isaac W. White purchased this triangle at a public sale in March, 1836, accompanied with proof that no written lease or memorandum of sale to him could be found; *second,* the will of Isaac W. White, probated in 1841, in which he states that he purchased the triangle, and that two of his sons were to pay the arrearages due and to become due therefor, and by which he devised the property to his wife for life, remainder to his children; *third,* a deed from the city of St. Louis conveying the triangle to Sophia White, dated eleventh of March, 1848—this deed does not set forth any recitals of a prior sale; the only recital being that the purchase price of $300 was paid by her; *fourth,* a deed from the children conveying the triangle to their mother, dated the thirteenth of May, 1853; *fifth,* the will of Sophia White, probated in December, 1858, and a deed by the executor of that will conveying the strip of ground in suit to Virginia Lount, one of the children of Sophia and Isaac White. This deed bears date the twenty-seventh of June, 1863, and was made pursuant to proceedings to which all the children were parties;

*sixth,* proof that Virginia married Millard, and a deed from them to the plaintiff, dated in 1882, in trust for Virginia.

The defendant introduced the following evidence: *First,* a deed from the city of St. Louis to Frederick Dent, dated the fifteenth of March, 1837, conveying to Dent thirty-eight and fifty-four-hundredths acres of land; *second,* a deed from Dent to Patrick Dillon, dated October 26, 1837, conveying the same land; *third,* the will of Dillon, probated in 1851, devising his estate to Barton Bates in trust with power to lease and sell lands; *fourth,* a lease on the lot in suit from Bates, as trustee, to P. D. Tiffany, dated the first of January, 1857, for twenty years. This lease was surrendered to Bates, and by him accepted in 1875; *fifth,* a lease from Tiffany to Henry Prante, dated the twenty-ninth of January, 1857, extending to the first of January, 1860; also, a lease from Tiffany to Fritz Walkenhorst, dated the twenty-sixth of April, 1857, extending to the first of April, 1860. These two leases covered the property in suit; *sixth,* evidence showing the appointment of the present defendant as trustee in the Dillon will in the stead of Bates.

There was much other evidence produced by the one side and the other which will be noticed hereafter.

1. The plaintiff, it will be seen, holds under the deed from the city of St. Louis to Sophia White, dated the eleventh of March, 1848, while the defendant holds under the deed from the city to Dent, executed and recorded long prior thereto, to-wit, in March, 1837. It is conceded by the instructions given, at the request of the plaintiff, the appellant here, that if this Dent deed is valid, as to the land in suit, then it has priority over the deed to Sophia White. To show its invalidity the plaintiff produced evidence that, on the second of April, 1836, a committee on commons recommended a

settlement with Dillon, and thereupon the board of aldermen passed this resolution: "That P. M. Dillon, George Morton and Frederick Dent, being the legal representatives of James Mackay, shall receive deeds for the land claimed by them, and which is within the survey of the commons, by their paying $20 per acre therefor."

Now, the deed to Dillon, executed by John F. Darby, mayor, describes the thirty-eight and fifty-four-hundredths acres as being in the survey of the commons, and also in the Mackay claim, and professes to have been made pursuant to a compromise made under the act of the legislature before mentioned. On its face it is a valid conveyance. The specific objection made to it is that, in point of fact, the property in suit is not within the Mackay claim, and, hence, the mayor had no right, under the resolution, to convey it to Dent. The evidence shows beyond all doubt that the land in question is a part of the land described in the Dent deed, and that it is also within the commons; but the evidence for the plaintiff tends to show that the south line of the Mackay survey runs along the center of Park avenue, and, hence, that survey did not embrace this property.

On the other hand the evidence for the defendant tends to show that the south line of the Mackay survey is an established line, and that it runs fifty odd feet south of the south line of Park avenue, and, hence, includes this property, On this state of the evidence the trial court could not, as a matter of law, say that the land in suit was not within the Mackay claim. Whether it was or not was a question of fact, and, hence, the court properly submitted this question to the jury.

It is next insisted that the court erred in excluding a resolution of the board of aldermen adopted on the

twelfth of June, 1838, which is to the following effect: "That this board does not recognize the deed made by John F. Darby as mayor deeding the thirty-eight and forty-five-hundredths acres to Dent, for the reason that he had not been authorized to make the deed." This resolution could not affect the validity of the deed previously executed and delivered to Dent, and, hence, it was properly excluded.

2.    The next branch of the case arises out of the claim that Sophia White acquired title by twenty years' adverse possession.    On this issue the plaintiff produced evidence tending to show that Isaac White took possession of the triangle and built a brush and board fence around it in the fall of 1836; that he built a stable and slaughterhouse thereon in 1837, and that he used the property for such purposes until he died, which was in 1841; that in 1842 his sons built a brick house on the property for their mother, Sophia White; that she moved into the house in that year and continued to reside there until her death, late in the year 1858; that for years before her death she had leased the part in suit to persons for a brick yard, and through her tenants had possession up to the twenty-ninth of January, 1857.

It is enough to say of this evidence that it tends to show twenty years' adverse possession in Isaac White and his widow, Sophia White, and that full instructions were given on this issue.    The court, however, refused an instruction based on the theory of ten years' adverse possession from and after the twenty-second of February, 1847, the date when our present ten years' statute of limitations went into operation.    The possession of Sophia White ceases on the twenty-ninth of January, 1857, as will be hereafter seen; hence, there could not have been ten years' adverse possession from and after

the twenty-second of February, 1847. The instruction was, therefore, properly refused.

3. This brings us to the effect to be given to an instrument by which Sophia White surrendered possession to Tiffany. The Dillon estate leased the lot to Tiffany for twenty years from the first of January, 1857. Tiffany, as has been said, made two leases, one to Prante, dated the twenty-ninth of January, 1857, and one to Fritz Walkenhorst, dated the twenty-sixth of the following April. Prante, it seems, then had possession under a lease from Sophia White, and, on the same day that he accepted the lease from Tiffany, he, Tiffany and Sophia White all executed a writing under seal, though not acknowledged or recorded, whereby she released Prante from so much of the lease held by him from her as covered this lot in question, and in which writing she says: "And I do hereby surrender and give up the possession of said strip to P. D. Tiffany, the lessee of P. M. Dillon's estate, in consideration that neither Tiffany nor the Dillon estate shall claim any damages of me for the occupancy thereof, nor for the land already excavated by said Prante, * * * it being understood that the object of this instrument is to legally surrender to said Dillon's lessee the possession of the ground above described, and to settle all claims against me by said Tiffany as such lessee of Dillon for occupying and excavating the same."

Mary L. Durfree testified, at the instance of the plaintiff, that she was present when Mrs. White signed this paper; that Mrs. White was then an old lady, had been sick, and was sitting up that morning for the first time in a week or more; that Tiffany came to the house and wanted her to sign a paper, which she at first refused to do; that she at last signed it, but she did so against her will. On cross-examination the witness stated that Tiffany made no threats of personal violence, but spoke

in a rough way and refused to wait until a son of Mrs. White came home; that Tiffany told Mrs. White she would lose her property if she did not sign the paper, but that he made no mention of any particular property which she would lose. The other evidence shows that from that day on to 1860, at least, the property was occupied by the tenants of Tiffany for a brick yard. It also appears that on the thirteenth of October, 1858, Mrs. White conveyed to Fritz Walkenhorst a part of the triangle, the part conveyed being fifty feet in width south of the lot in suit. In this deed she describes the north line by calling for the south line of James Mackay's confirmation, according to United States survey number 3123, and speaks of the lot now in question as owned by the devisees of Patrick Dillon.

On this evidence the plaintiff asked, but the court refused, an instruction to the effect that if Tiffany induced or caused Sophia White to sign the paper against her will, by threats or conduct which was calculated to and did overawe her, then the paper is void, and Tiffany acquired no right of possession thereby. On the other hand the court, at the request of defendant, told the jury that this paper was in legal effect a complete surrender of possession to Tiffany.

There is here no evidence of duress of person; for there is no pretense that Tiffany threatened any personal violence or injury. Nor is there any evidence of duress of property. Duress of goods, it is generally said, may exist where one is compelled to submit to an illegal demand or exaction in order to obtain them from one who has them in possession, but refuses to give them up, except on a compliance with the illegal demand. Tiffany did not have any of her property in his possession, nor did he cause her to sign the writing by any threatened unlawful seizure or destruction of her property. The very most that can be said of this

evidence is that he threatened suit in case she did not sign the paper—a suit in which she would have had her day in court. In our opinion the evidence utterly fails to show duress of person or property. *Silliman v. United States,* 101 U. S. 465.

We are cited to *Davis v. Luster,* 64 Mo. 43, where it is said courts of equity will relieve parties from contracts made under the influence of threats, though the threats do not amount to legal duress. But all this does not aid the plaintiff, for this is not such a suit. This property was occupied by the tenants of Tiffany without any effort on the part of Mrs. White to remove them for several years; and some twenty months after the date of that instrument she made the deed to Walkenhorst in which she refers to this property as belonging to the Dillon estate. Under these circumstances and after the long delay she would not be heard to complain even in a court of equity.

It follows from what has been said that the court did not err in refusing the plaintiff's instruction. It was certainly the duty and province of the court to give the jury instructions as to the legal effect of the document, and, hence, there is no error in the instructions given at the request of the defendant on this branch of the case.

But it is further contended that the court erred in not leaving it to the jury to say when this written surrender of possession to Tiffany was in fact executed and delivered. As before said it bears date the twenty-ninth of January, 1857, and to aid the plaintiff it must appear that it was executed and delivered at a date subsequent to the twenty-second of February, 1857, so as to admit of instructions on the theory that Mrs. White had ten years' adverse possession after the act of twenty-second of February, 1847. The presumption is that the instrument was executed and delivered on the day

of its date, and that must be taken as the true date until there is some evidence that it was signed and delivered at a later date. Now the witness, Mrs. Durfree, gives it as her opinion that it was signed by Mrs. White in 1855 or 1856. She says in one part of her evidence that it may have been in 1857, but she thinks it was not later than 1855. The only circumstance tending to show that it was signed later than the day it bears date is the fact that the lease from Bates as trustee to Tiffany, though dated the first of January, 1857, was not acknowledged until the third of February, 1857. If we assume that this lease was not delivered to Tiffany until the last-named date and infer that he did not procure the written surrender of possession until he got that lease, still all this does not tend to show that the written surrender of possession was in fact made on or subsequent to the twenty-second of February. There is in our opinion no evidence whatever that this instrument was signed by Mrs. White on or after the twenty-second of February, 1857, and the court, therefore, did not err in refusing the instruction which sought to leave it to the jury to say when that instrument was in fact executed and delivered.

4.    This brings us to that branch of the case wherein the plaintiff for title sets up ten years' adverse possession in the Millards. Millard testified that he first knew the property in 1864, when he and Virginia were married; that he then found the lot vacant, except indications of an old brick kiln; that in 1865 he employed Walkenhorst to level up the lot and build a fence around it. In June, 1866, Millard and wife gave Walkenhorst a lease from month to month, which sets out by way of recital that the lessee had leveled up the lot in December, 1865, and built a fence in 1866, and during that time held possession of the lot for the lessors.

Millard says he left the property in charge of an agent in 1869; and this agent says he repaired the fence at that time and gave a Mr. Putting the right to use the lot for a wagon yard, and that it was so used until 1879. There is evidence on the other hand tending to show that Putting used the lot by permission from the representatives of the Tiffany estate, and that the fence soon disappeared. The proof is undisputed that in 1879 the Dillon estate erected several brick buildings on the lot at a cost of some $10,000. The possession of the Millards did not begin prior to December, 1865, and whether it began at that time depends upon the fact whether they can reap any benefit from their lease to Walkenhorst. He, it is to be remembered, held a lease on the same property from Tiffany, and though he ceased to pay rent under that lease in April, 1860, yet the lease contained a further clause whereby the lessee agreed to hold possession after that date until demanded by Tiffany. Except in the cases mentioned in the statute (R. S. 1879, sec. 3080), the attornment of a tenant to a stranger is void. The attornment to a stranger does not affect the possession of the landlord in the least. *Schultz v. Arnot*, 33 Mo. 172; *Bank v. Clavin*, 60 Mo. 559; *Farrar v. Heinrich*, 86 Mo. 532. Unless Walkenhorst had surrendered possession to Tiffany, this new lease from the Millards was no more than an attornment to a stranger, and did not affect the possession of Tiffany.

The plaintiff, however, complains of the fifth instruction given at the request of the defendant, on the ground that it assumes that Walkenhorst never surrendered possession to Tiffany, and that the lessee attorned to the Millards whilst a tenant of Tiffany.

This instruction says, in substance, that, if Walkenhorst took and retained possession under the Tiffany lease, then that lease required him to deliver

the premises to Tiffany, either on the first of April, 1860, or some time thereafter, and until this was done he had no right to yield up possession to the Millards, and his possession continued to be the possession of Tiffany. We think the instruction is not open to the criticism. The very first clause required the jury to find that Walkenhorst took and held possession under the Tiffany lease. It proceeds from first to last upon the theory that the jury must find that he had never surrendered possession to Tiffany or to those claiming under him. This is still the more manifest when we take this instruction in connection with the eighth given at the request of the plaintiff, which in clear terms asserts the proposition that if Walkenhorst had surrendered possession under the Tiffany lease, then he had a right to take the lease from the Millards.

5. Complaint is also made of the following instruction given at the request of defendant: "The court instructs the jury that in order to bar the true owner of land, by adverse possession of another, such adverse possession must have been known and acquiesced in by him for ten years, or else the possession under the adverse claim must have been open and notorious, continuous and exclusive, for the requisite period of time as defined in other instructions."

The objection made to this instruction is that it requires the adverse possession to be known and acquiesced in by the true owner for ten years to constitute a bar. What it says is that the adverse possession must have been known and acquiesced in by the true owner, or it must have been open and notorious, continuous and exclusive. The idea which the instruction conveys is that a possession which is adverse and also known to the true owner is equivalent to a possession which is adverse and also open and notorious. This we think is a correct statement of the law. The

law requires the adverse possession to be open and notorious in order to notify the real owner of the possession and claim of the disseizor. From adverse possession which is open and notorious the law presumes notice to the true owner. Hence, it has been said: "In view of the reason for the rule requiring notoriety of possession, namely, that notice may be given to the owner * * * it would seem that if the owner had already actual knowledge of the adverse possession and claim, then, as it is expressed in the case just cited, 'openness and notoriety are unimportant.'" Sedgwick & Wait on Trial of Titles to Land [2 Ed.] sec. 736. This same doctrine finds support in *Key v. Jennings*, 66 Mo. 367, where it is said, after alluding to the reason of the rule requiring the possession to be open and notorious: "In the case before us, nothing is left for presumption, as the evidence shows actual knowledge on the part of Thurmond of Stewart's claim and possession, and acquiescence in it."

The same principle is again mentioned with approval in the recent case of *Allen v. Mansfield*, 108 Mo. 343. A possession, we conclude, which is adverse and known to and acquiesced in by the true owner for a period of ten years, will bar the true owner under the statute of limitations.

Without pursuing all the minor objections, it is sufficient to say that we have examined this long record with its complicated facts with care, and see no reason why the judgment should not stand. The judgment is, therefore, affirmed. All concur.