MENANTIC S. S. CO., Limited, v. PEIRCE et al.

(District Court, S. D. New York. July 5, 1898.)

CHARTER PARTY—CONSTRUCTION—"FULL REACH OF WHOLE CARGO CAPACITY"—ACQUIESCENCE IN DISPUTED CLAIM—PROTEST.

A charter of the steamship M. for a fruit cargo and other merchandise from Mediterranean ports at a lump sum, granted the "full reach of the whole of the cargo capacity including half deck." At Palermo the charterer claimed the right to load fruit in the cattle spaces on the spar deck, for which the M. had been fitted; the captain refused to load in those spaces, and the dispute was referred to the owner in London, who telegraphed: "Allow cattle deck, but under protest and shipper's risk": whereupon the fruit was received, but the master lodged a protest claiming extra freight for the fruit so carried, and by this libel sues for this extra freight money. Held, that the charter granted all cargo spaces for which the ship was arranged and adapted, and included the "shelter deck" for fruit, which was less burdensome and inconvenient to the ship than cattle in the same spaces; (2) that the receipt of the fruit on the owner's order, was a voluntary acquiescence in the respondent's claim of right, without duress, and allowed no subsequent right of recovery of extra freight, contrary to the intent of the charter; and that the master's claim thereto in the protest was without authority and ineffectual.

This was a libel in rem by the owner of a steamship to recover from her charterers freight collected by them for cargo alleged to have been carried in excess of the charter obligations.

Convers & Kirlin, for libelant.
Wilhelmus Mynderse, for respondents.

BROWN, District Judge. The libel was filed by the owner of the steamship Massapequa against the charterers of that ship to recover the freight collected by the charterers on green fruit carried on the upper deck in the cattle spaces of the steamer, on the ground that this carriage was in excess of the charter obligations.

The case turns upon the construction of the language of the charter, and the effect to be given to the dealings of the parties.

The charter was dated April 29, 1896, for the transportation from Mediterranean ports of a cargo of fruit or other lawful merchandise. It gave to the charterers the "full reach of the whole of the cargo capacity including the half deck," and no cargo to be taken in any part of the steamer without consent of the charterers. The ship took on board about 2,000 tons of white stone, and the rest of the cargo was green fruit, mostly from Messina and Palermo, the fruit occupying much the greater space.

On the upper spar deck near the center of the ship, and on each side of the smokestack, there was an inclosed space about 80 feet long. There was a similar inclosed space from 18 to 20 feet long at each end of the ship. The libelant's manager testifies that the inclosed space in the center of the ship forward of the smokestack, was what was understood as the "half deck," the inclosed spaces at the extreme ends being used as quarters for the seamen or officers. Between these inclosed spaces the deck, as the ship was originally built, was wholly open. Afterwards these open spaces, each about 80 feet long, both forward and aft of the central inclosure, were themselves mostly inclosed for the purpose of transporting cattle, and they were fitted up with suitable fixtures for that purpose, the spaces being boarded up firmly with two-inch plank, and a roof built over the inclosures of sufficient strength for use in the discharge of cargo. These spaces were called by the libelant the "shelter deck," presumably as affording shelter for the cattle. In the roof of each of these two cattle inclosures there was a large opening immediately above the hatches of the spar deck, somewhat larger than the hatches themselves, being about 20 feet long by 18 feet wide. These openings had no coamings and no hatch covers and were always open for ventilation. There were other openings in the sides of the inclosures to promote circulation of air.

The respondents, who were engaged in the transportation of fruit, had for several years been accustomed to load two other steamers (not of the libelant's line) that had similar cattle structures on the spar deck; they had been accustomed to use the cattle spaces for the stowage of green fruit along the side of the ship, and these spaces were considered the most desirable for fruit of all the spaces in the ship, owing to the superior ventilation.

In the negotiations preceding the execution of this charter, the Massepequa was described as having a permanent wood shade deck for cattle, but a spar deck of iron. Such a spar deck, if not covered or in any way sheltered from the sun, would be deemed objectionable for fruit cargo, owing to its greater transmission of heat.

A portion of the fruit was loaned at Messina, and the balance at Palermo. At Palermo the respondents' agents proposed loading fruit on the shelter deck. The master objected that the charterers were not entitled to the use of this space under the terms of the charter, and that it was not a proper place to carry fruit. The respondents claimed that it was a part of the ship's "cargo capacity" to which they were entitled. The dispute was referred to the owner in England, who telegraphed to the master: "Allow use of shelter deck under protest and at charterers' risk." The cattle spaces were accordingly used for fruit, and the respondents, it is agreed, collected freight amounting to about $1,300 upon the fruit stowed in those spaces. The libel seeks to recover from the respondents the amount of freight thus collected, as collected for the libelant's use.

In the case of Neill v. Ridley, 9 Exch. 677, where a charter had let the "whole reach of the vessel's hold from bulkhead to bulkhead, including half deck," and the charterers had loaded a few cattle in the cattle spaces on deck, after notice that the freight therefor must be paid to the owners, it was held that the owners were entitled to the freight for the cattle, on the ground that the terms of the charter excluded the use of the deck spaces. Here the terms of the charter not only contain no such exclusion but give to the charterers the "whole cargo capacity of the ship, including half deck," and exclude the owner from carrying any cargo at all without charterers' consent. There is no doubt that cattle, when carried, are part of the cargo of the ship. The phrase "cargo of cattle" is not unfamiliar. Cattle are merchandise, and under that term have been held covered by a policy of insurance. Strictly, therefore, it cannot be said that the space designed to be used for the transportation of cattle, is not "cargo capacity of the ship," although from its exposure it may not be suitable for ordinary merchandise. The form of charter used in this case was that of a fruit charter, and so headed at the top. But it was designed, as it states, for the purpose of carrying fruit and other lawful merchandise. About 2,000 tons of white stone were carried in the hold; and had the charterers insisted on carrying some cattle on the shelter deck, making their own provisions for doing so, there is certainly nothing in this charter or in the evidence which would exclude them from this use of the shelter deck, or require them to account to the owner for the freight on cattle so carried. The use of the same spaces for fruit instead of cattle, was less burdensome, and less inconvenient to the ship, than the carriage of cattle would have been; so that I fail to see any equity in the ship's present demand.

The libelant claims that the expression "including the half deck," excludes by implication the use of the shelter deck. The circumstance however that appears in evidence, namely, that the half deck is sometimes used for the ship's coal, as it was in fact used on this

voyage, is a sufficient explanation of this express provision, and imports no limitation, therefore, of the broad grant of "the whole cargo capacity" to the charterers.

In my judgment this broad grant of "the full reach of the whole of the cargo capacity" of the ship, includes all the cargo spaces wherein any lawful merchandise could properly be stowed, except only such spaces as the charter itself reserves, or such as are usually and necessarily reserved for the uses of the ship in the prosecution of the voyage. The expression naturally imports all the cargo spaces for which the ship is adapted and fitted. This is strengthened by the clause excluding the owner from any right to carry cargo without the charterers' consent. The fact that cattle spaces were provided on the upper deck, is sufficient proof that that portion of the ship was not necessary for the use of the ship in navigation; nor is it contended that more of these deck spaces were used for fruit than might have been used for cattle, or more than was reasonably compatible with the ship's own needs. No doubt in loading cargo in an exposed part of the ship the charterers must take the risks belonging to it, as they did in this case, and as the evidence shows they expected to do from the first. Their use of these spaces was beneficial to themselves, but it was also in harmony with the ship's arrangements; and from their prior use of similar spaces in other vessels, and the fact that notice that this ship was provided with these spaces was communicated to them and to their agents at the very outset of the negotiations for this charter, I think they were justified from the first in expecting this use of the ship's cattle spaces for fruit. Had the owner wished to exclude the use of the shelter deck, which by the very plan of the ship as she was then fitted up and represented, contemplated the use of this part of the ship for cargo, he should have excepted this part of the ship, instead of granting the "full reach of the whole cargo capacity," an expression that seems to me the strongest that could be used to grant every part of the ship that was designed or fitted to carry cargo.

The dealings of the parties leading to the carriage of the fruit in the cargo spaces also seem to me to preclude the libelant from recovery in this action. On the 23d of May the fruit was alongside of the vessel at Palermo. The master had persistently refused to receive it. The charterers had insisted on their legal right to the use of the shelter-deck spaces from the first, as a part of the cargo capacity, and on that ground they had prepared a protest against the master's refusal to receive the fruit in these spaces, while allowing the ship to sail, though in violation of their rights as they conceived them. At that moment the master received a telegram from the owner: "Allow cattle deck but under protest and shippers' risk." The fruit was thereupon loaded the same evening. The master testifies that when notice of this telegram was given to the respondents' agent, he also told the agent that he would charge freight for the fruit. The agent contradicts this testimony, and I think this notice was probably not given till the next day, when the ship's protest was prepared and served upon the respondents' agent. This instrument, after reciting that the captain, in consequence of the

charterers' and their local agent's insistence and explicit orders to load cargo on the cattle-shelter deck, had allowed the charterers to stow an extra quantity of cargo in the space above mentioned, "protested against the charterers and their agents, holding them responsible for the breach of said charter party in the use of said cattle-shelter deck, and claimed the extra amount of freight due for such space at the rate of 1/6 per box above and beyond the sum due by charterers under the charter party, and reserved the right to proceed against the aforesaid charterers at time and place convenient."

I do not regard it as material whether notice that extra freight would be claimed was given before the cargo was put on board, and before the ship's protest was made or not; first, because such a claim was not within the master's authority, and second, because without effect. The dispute between the charterers' agent and the master as to the right of the former to the use of the shelter-deck spaces had been referred for decision to the owner; and his decision was made and communicated by the telegram above stated. The master had no authority to add to the terms and conditions of this telegram, or to the permission to load which it granted. The master's claim to freight was also without effect, because he could not by any such mere notice create a right to extra freight which would not otherwise exist. The circumstances show plainly that the charterers did not acquiesce in any such claim, and the captain knew it. The charterers claimed the use of the shelter deck as a claim of right. The owner so understood it, and the owner finally assented to the use of this space at the charterers' risk, though under protest. This assent was voluntary on his part. There was no duress or constraint upon the ship, the master or the owners. The direction to take the goods under protest, emphasizes the voluntary character of the assent by asserting that the ship was not bound to take them. The protest had no other effect. It could not create any obligation on the charterers' part to pay freight to which they did not assent, nor weaken their claim of right, nor did it qualify the voluntary acquiescence of the owner in the carriage of the goods, inasmuch as there was no duress or constraint. Such an unconstrained acquiescence in a claim of right, though accompanied by a protest, in my judgment gives no ground for a subsequent recovery, any more than a voluntary payment of money under protest can be recovered back where the payment has been made with full knowledge of the facts. The best authorities are adverse to any such subsequent right of action. Preston v. City of Boston, 12 Pick. 713; Flower v. Lance, 59 N. Y. 603; Doyle v. Rector, etc., Trinity Church, 133 N. Y. 372, 31 N. E. 221; Silliman v. U. S., 101 U. S. 465.

The case would have been quite otherwise had the circumstances indicated anything in the nature of a temporary compromise between the master and the charterers with an express or implicit agreement to submit to future legal determination the question as to which should be held entitled te the freight. To permit the owner to recover in this action would be in effect a violation of the express provision of the charter that the owner should carry no cargo without the consent of the charterers. The intent of this phrase is in ac-

cord with the previous provision that the charterers should have the whole benefit of the ship's cargo capacity, and it was intended to exclude the owner from any benefit from the carriage of cargo except with the charterers' consent. Manifestly the charterers have never consented that the owner should have the benefit of this freight. My conclusion is that upon the terms of this charter the owner has no legal right to the freight in question; first, because the goods were carried within the "full reach of the cargo capacity of the ship"; and second, if this were doubtful, the acquiescence of the owner in the respondents' claim of right, would preclude any subsequent recovery, notwithstanding the protest, in the absence of any agreement, express or implied, to submit the question for future decision.

The libel should be dismissed with costs.