SUSAN F. EARLE *vs.* RUDOLPH BERRY.

PROVIDENCE—MAY 29, 1905.

PRESENT: Douglas, C. J., Dubois and Blodgett, JJ.

(1)   *Duress.*

A refusal to make payment of an indebtedness, unless the creditor will sign a receipt acknowledging that the sum paid is in full settlement, does not constitute duress.

(2)   *Release.   Seals.   Receipts.*

Gen. Laws cap. 202, § 12, provides that "Any instrument purporting to be a release of all claims and demands or of any special demand, whatever be the consideration expressed therefor, shall be construed to have that effect although no seal shall be affixed thereto":—

*Held,* that an instrument acknowledging the receipt of a sum of money and therein stating that such sum was "the entire amount due," while not in form a release, was more than a mere receipt.

(3)   *Accord and Satisfaction.*

*Held,* further, that, the amount due having been in dispute, the offer and acceptance was binding as a compromise, and the instrument could not be contradicted except upon proof of mistake, fraud, duress, or undue influence.

ASSUMPSIT.   Heard on petition of defendant for new trial, and granted.

DOUGLAS, C. J.   At the time to which this action relates, about September 2, 1902, the plaintiff and her family were the owners of ninety shares of the capital stock of the Phœnix Iron Foundry, a corporation doing business in the city of Providence, but all but five of these shares were hypothecated for debts: sixty-three shares to the Mechanics Savings Bank to secure a loan of $12,600, and twenty-two shares to Alfred Metcalf to secure a debt of $8,000.   The plaintiff's husband

was a salaried officer of the company, and her two sons were employed there. One hundred and seventeen shares of the stock were owned by Edwin A. Smith, who was treasurer of the Mechanics Savings Bank. The balance of the stock, thirty shares, was in the treasury of the company.

On September 2nd, as he testifies, but probably a day later, the complainant's husband, who represented her in these transactions, received the following letter:

"PROVIDENCE, R. I., September 3, 1902.

*"Mr. Charles R. Earle, Treasurer:*

"DEAR SIR:—I have to inform you that I have disposed of my holdings in the Phœnix Iron Foundry, having sold all my stock to Mr. Percy H. Brundage, of 49 Wall Street, New York, for $300 per share, the same to be paid for at the Rhode Island Hospital Trust Company on October 1st, 1902, and he will take all the other stock at the same price provided he is notified of the same on or before September 15th.

"Yours truly,

"EDWIN A. SMITH."

The purchaser referred to in the letter was acting in the interest of the Textile Finishing Machinery Company, which had acquired a controlling interest in several other manufacturing corporations, and Mr. Earle, on receipt of this letter, was alarmed lest this new controlling power should wind up the business of the Phœnix Iron Foundry, terminate his employment, and force the plaintiff to sell her stock at the price offered. He consulted counsel, who advised him that the treasury stock could lawfully be sold by the directors, and thereupon he conceived the plan of purchasing it for his wife and thus giving her the control and thereby enabling her to continue the business or to demand a larger price for her original shares. At first he endeavored to persuade Messrs. Berry & Boyden, a firm of which the defendant was a partner, to advance the money needed to pay for the treasury stock and to redeem the stock which had been pledged. He also approached other capitalists with similar propositions.

Finally he procured nine thousand dollars from Alfred Metcalf and placed it in the hands of the defendant, who paid it into the treasury of the company and received therefor a certificate in his own name of the thirty shares of treasury stock. At the same time Mr. Metcalf entrusted the plaintiff's husband with the stock which he had held as security, and certificates for this stock were also placed in the defendant's hands.

Mr. Earle continued negotiations with the agent of the Textile Company, and finally received and accepted, on behalf of his wife, an offer of $500 per share for the ninety shares originally controlled by her and $300 per share for the thirty shares purchased of the corporation.

The defendant, on September 30th, with his own money paid the note at the savings bank with interest from July 1 to October 1st, amounting to $12,757.50 and obtained possession of the certificate which the bank had held.

On October 1, 1902, the plaintiff's stock having been sold and the defendant having received $54,000 therefor, the parties met for a settlement. The defendant retained $2,500 for his own services, paid the counsel who had been employed $1,200, and, deducting the amount he had advanced to the Mechanics Savings Bank, paid the plaintiff the balance, $20,542.50, and the amount due Mr. Metcalf, $17,000 (who had given an order to pay this sum to Mrs. Earle), and took the following receipt:

"PROVIDENCE, R. I., Oct. 1, 1902.

" Received from Rudolph Berry $37,542.50, of which $17,000 is [to be] paid in cash to Alfred Metcalf, and the whole is the entire amount due from him on account of $54,000, collected by him on sale of stock in the Phœnix Iron Foundry by myself and others to Courtland C. Earle, as well as ourselves.

"SUSAN F. EARLE,
"CHARLES R. EARLE, and
"COURTLAND C. EARLE, by
"CHARLES R. EARLE."

This suit was brought March 19th, 1903, to recover the sum of $3,850, which it was alleged the defendant had wrongfully retained out of the sum of $54,000 collected on her account.

The defendant pleaded the general issue and a plea in set-off, claiming that the plaintiff owed him $5,000 for services in advancing $12,757.50 to the Mechanics Savings Bank and for consultations in regard to the disposal of the stock and for payments to the attorneys and for his services in the premises.

November 14, 1904, the jury found a verdict for the plaintiff in the sum of $2,667.50, being $2,425 damages, and interest to the date of the trial, $242.50, thus allowing the defendant the amount he had paid the attorneys and $75 for his own services, and the defendant now brings his petition for a new trial on the grounds that the verdict is against the law and evidence; that there had been an accord and satisfaction of the claim in suit before the suit was commenced; that the court erred in charging the jury as requested by the plaintiff's counsel's requests 3 and 4; and that the amount of the verdict is excessive.

The plaintiff's case rested on the establishment of two propositions of fact: 1st. That the defendant retained more money for his services than he was legally entitled to. 2nd. That the plaintiff's signature to the acknowledgment of full payment which she signed was procured by duress.

We think she fails to sustain either proposition by satisfactory evidence.

Mr. Earle's statement of Mr. Berry's relation to the transactions between them makes him only a voluntary lender of $12,757.50 for one day, upon ample and undoubted security. If this were his only service, a commission of from fifty to one hundred dollars, as estimated by the stock brokers who were called as witnesses, would seem to be sufficient compensation. Mr. Berry says that his agreement with Mr. Earle was to assist him with advances necessary to obtain control of the one hundred and twenty shares, and if the Textile Finishing Machinery Company should buy them, he should have five thousand dollars of the profits. If, on the contrary, the Textile Finishing Machinery Company should not purchase the stock, then he should furnish sufficient money to acquire all the stock and to carry on the business, and in the latter case should retain a controlling interest in the business. If this was the agreement,

the amount of twenty-five hundred dollars was not excessive compensation for the risk he assumed. We think Mr. Berry's story accords better than Mr. Earle's with the undisputed circumstances in which the parties were placed. The Textile Finishing Machinery Company, in purchasing Mr. Smith's stock, supposed they were securing control of the corporation. Mr. Smith had stipulated for the plaintiff that she should receive the same price that he had obtained for himself. He had acted in good faith towards the Earles. But he was also the treasurer of the bank, and when he found that by the device of using the treasury stock the Earles had outwitted him and his customer, it was to be feared that he might retaliate by causing the bank to sell the pledged stock. Mr. Earle told Mr. Berry that the note was not due for six months; but the note itself, which is in evidence, shows that it was a demand note and that the last interest had been paid only to July 1, 1902. Mr. Earle attempts to explain his statement to Mr. Berry by saying that he had a verbal agreement with Mr. Smith not to enforce payment of the note for six months, but such an agreement would have no binding force. Mr. Smith then had it in his power to make good to the Textile Finishing Machinery Company his agreement to deliver a majority of the stock, or, if they declined to go farther with the bargain, to demand from the Earles that they should redeem their pledged stock and purchase his holdings. The requirement in the charter that the stock should first be offered to the corporation could not have hindered such a sale, for the foundry had just emerged from the hands of a receiver and had no money to pay out in acceptance of such a proposition. Something more was needed than a mere honest custodian of the stock and proceeds; to wit, a capitalist, able and willing in case of necessity to provide funds to satisfy present creditors and to continue the business, and this is the position which Mr. Berry says he agreed to fill.

This question, however, of the value of the defendant's services depends upon conflicting evidence; and though we believe the jury erred in their decision of it, we should not feel warranted for this reason alone in granting a new trial.

Upon the next question of fact there is nothing in the plaintiff's favor worthy of the name of evidence. The claim of duress rests upon the testimony of Mr. Earle alone, and he had been discredited by his statements to Mr. Berry, repeated at the trial, that the savings bank note could not be enforced until December, which a production of the note itself conclusively contradicts.

Mr. Earle's testimony does not show any act of coercion on the part of the defendant. It is in substance that he presented an order from Mr. Metcalf directing the payment of his $17,000 to Mrs. Earle, and Mr. Berry refused to pay that until a receipt was prepared, for Mrs. Earle to sign, showing the disposition of the whole of the money and that after the paper was prepared, Mr. Berry still refusing to pay what he admitted to be due unless she would sign the paper, he and the plaintiff concluded to sign it in order to get what Mr. Berry admitted to be due. His testimony is reported as follows: "Q. What took place in regard to the settlement? A. Then I asked him to give the money to Mrs. Earle. Q. Did you state what money? A. Yes, sir. Q. What money did you state? A. All of it. Q. How much was it?. A. $54,000. Q. What reply did Mr. Berry make to that? A. He said he was not going to give it all to her. Q. What did you then ask him? A. I said then—I took the order from Mr. Metcalf and presented the order, and I said, 'Give me that.' Q. How much did that order call for? A. I think that order called for $9,000; there were twenty-two shares that he bought of me. It was not necessary, but I handed it to him. . . . Q. Now, what reply did Mr. Berry make to your demand for the $17,000, called for by the order of Alfred Metcalf? A. Well, now, Mr. Angell was very busy getting out some writing or paper and he brought it in, when he finished it he brought it in to Mrs. Earle, and I read it; it was a receipt for so much money, what she received, some $35,000 that he wanted to pay her, but she did not want to take it. I said, 'Now, I will ask him for the $17,000.' I took that paper in there and demanded that. Q. Of whom? A. Of Mr. Berry. Q. What reply did he make to you? A. He said he would not pay one without the whole

of it. Q. Did you make any demand for any portion of this sum? A. I made a demand for that. Q. Did you make any further demand upon him for the $9,000? A. No, I made demand for that. Q. Did you make any further demand besides the whole of the money and this part here? A. Why, yes, sir, I did say—I think I told him that after he declined to give me that, I said, 'Give me the $9,000.' Q. What reply did he make to that? A. He said he would not give me any until Mrs. Earle signed that paper. Q. And then what was done? A. Well, after some little time and waiting and thinking it over, I says, 'All there is about it, I will sign that paper and see him afterwards.' Q. Did you tell him so? A. I said it so he could hear it, in his presence. Q. Did Mrs. Earle have any talk with him, or his attorney, in regard to signing that paper? A. She asked Mr. Parkhurst, I think, what she should do about it. Q. Did she speak to Mr. Berry about it, whether or not she would sign the paper—did she speak to him about it? A. She said she did not want to sign that paper, yes, sir. Q. And the result was, as you said, that the paper was finally signed? A. Yes, sir. Q. Who signed it? A. Mrs. Earle signed it and I did. It was a receipt, that is all it was, simply a receipt.''

Mrs. Earle says she had no conversation with Mr. Berry at all. She only knows what her husband told her of the discussion between him and Mr. Berry. She signed the paper reluctantly, after her counsel had advised her to do so.

Mr. Earle is contradicted by Mr. Parkhurst, Mr. Berry, and Mr. Angell, as to any refusal by Mr. Berry to pay over the amount he admitted to be due unless the plaintiff would agree that it was the whole sum due. After the money had been drawn Mrs. Earle acknowledged her obligation to Mr. Berry and thanked him for what he had done. And no demand for any further sum was made upon Mr. Berry until the following March. As a matter of fact the controversy between Mr. Earle and Mr. Berry seems to have been in respect to the attorney's bills, not in regard to Mr. Berry's compensation. Mr. Earle, all through the interview, denied his obligation to the attorneys and persisted at the trial that they were not employed

by him, but the evidence that their services were engaged and employed for the plaintiff's benefit is most convincing. The jury did not sustain Mr. Earle in this assertion, for the verdict allows the defendant the sums he paid the attorneys.

The evidence so strongly preponderates against the claim of duress or coercion that we feel certain the jury did not rightly appreciate the question before them and we are confirmed in this view by an examination of the exceptions taken by the defendant to the charge of the court.

Plaintiff's counsel requested the court to charge:

(1)     "III. That if the jury find that the plaintiff signed the receipt offered in evidence in order that she might obtain the amount which it was undisputed belonged to her, after refusal on the part of the defendant to give it to her, unless she did so, then the receipt is not binding upon the plaintiff, and she may recover, notwithstanding the statements contained in it."

And "IV. That the receipt signed by the plaintiff is not conclusive, but is only evidence of a settlement, and the whole transaction and circumstances under which it was given may be gone into to explain it or avoid it."

These requests were granted, and the defendant duly excepted.

To the last statement the presiding justice added the following observations: "That is true—it would be a different thing if it was under seal; it is not, it was simply a receipt made and signed," &c.

The first instruction goes farther than any reported case. It would have been correct if the defendant had been in possession of the plaintiff's goods and had refused, without right, to deliver them unless upon payment of money not due. Duress of goods is recognized by the law as a cause for setting aside a contract or for allowing recovery of money paid. But a threat to withhold payment of a debt or to refuse performance of a contract is not duress. 9 Cyc. 448d. The discrimination between duress and such inequitable conduct as is charged by the plaintiff in this case is clearly made by Cooley, J., in *Hackley* v. *Headley*, 45 Mich. 569, where it is held that "refusal, on demand, to pay a debt that is due, thereby forcing the creditor to receipt in full for only a partial payment, does not constitute

duress if the debtor has done nothing unlawful to cause the financial embarrassment which compelled him to submit to the extortion." The opinion cites and analyzes the following cases: *Astley* v. *Reynolds,* 2 Str. 915; *Smith* v. *Bromley,* Doug. 696; *Ashmole* v. *Wainwright,* 2 Q. B. 837; *Harmony* v. *Bingham,* 12 N. Y. 99; *Scholey* v. *Mumford,* 60 N. Y. 498; *Chase* v. *Dwinal,* 7 Me. 134; *Shaw* v. *Woodcock,* 7 B. & C. 73; *Nelson* v. *Suddarth,* 1 H. & Munf. 350; *White* v. *Heylman,* 34 Penn. St. 142; *Sasportas* v. *Jennings,* 1 Bay, 470; *Collins* v. *Westbury,* 2 Bay, 211; *Crawford* v. *Cato,* 22 Ga. 594; *Chandler* v. *Sanger,* 114 Mass. 364; *Spaids* v. *Barrett,* 57 Ill. 289; *Bates* v. *Insurance Co.,* 3 Johns. Cas. 238; *Beckwith* v. *Frisbie,* 32 Vt. 559; *Adams* v. *Reeves,* 68 N. C. 134; *Briggs* v. *Lewiston,* 29 Me. 472; *Grim* v. *School District,* 57 Penn. St. 433; *First Natl. Bank* v. *Watkins,* 21 Mich. 483; *Skeate* v. *Beale,* 11 Ad. & El. 983; *Preston* v. *Boston,* 12 Pick. 14; *Wilcox* v. *Howland,* 23 Pick. 167; and continues: "Many other cases might be cited, but it is wholly unnecessary. We have examined all to which our attention has been directed, and none are more favorable to the plaintiff's case than those above referred to. Some of them are much less so," citing *Atlee* v. *Backhouse,* 3 M. &. W. 633; *Hall* v. *Shultz,* 4 Johns. 240; *Silliman* v. *United States,* 101 U. S. 465, and sums up the case as follows: "In what did the alleged duress consist in the present case? Merely in this: that the debtors refused to pay on demand a debt already due, though the plaintiff was in great need of the money and might be financially ruined in case he failed to obtain it. It is not pretended that Hackley and Mr. Gordon had done anything to bring Headley to the condition which made this money so important to him at this very time, or that they were in any manner responsible for his pecuniary embarrassment except as they failed to pay this demand. The duress, then, is to be found exclusively in their failure to meet promptly their pecuniary obligation. But this, according to the plaintiff's claim, would have constituted no duress whatever if he had not happened to be in pecuniary straits; and the validity of negotiations, according to this claim, must be determined, not by the defendant's conduct, but by the plaintiff's necessities. The

same contract which would be valid if made with a man easy in his circumstances becomes invalid when the contracting party is pressed with the necessity of immediately meeting his bank paper. But this would be a most dangerous as well as a most unequal doctrine; and if accepted, no one could well know when he would be safe in dealing on the ordinary terms of negotiation with a party who professed to be in great need."

In *Silliman* v. *United States, supra,* the owners of certain barges which were employed by the quartermaster's department claimed that they were forced by duress of their property to sign new charter parties at a reduced rate, but the court held that neither the forcible retention of the barges nor the refusal to pay the compensation agreed upon constituted duress. Harlan, J., says: "They yielded to the threat or demand of the department solely because they required, or supposed they required, money for the conduct of their business or to meet their pecuniary obligations to others. . . . We are aware of no authority in the text-books or in the adjudged cases to justify us in holding that the last charter parties were executed under duress. There is present no element of duress, in the legal acceptation of that word. The hardships of particular cases should not induce the courts to disregard the long-settled rules of law."

*Adams* v. *Schiffer,* 11 Col. 15, was a bill in equity to set aside settlements and conveyances alleged to have been induced by fraud and oppression. The court found that the defendant's conduct amounted to duress of goods, but they say (p. 40): "It was, therefore, not a mere withholding of a debt due from himself, but an unlawful interference between the plaintiff and other debtors, by means of which he stopped the payment to plaintiff of sums due him; and presents a case analogous to that of *Vyne* v. *Glenn,* 41 Mich. 112; reviewed by Mr. Justice Cooley in *Hackley* v. *Headley,* 45 Mich. 577. We are of the opinion that the settlement of the 1st of August was clearly made under duress of property, and must be held null and void."

In the light of these cases, which are the only ones brought to our attention where the retention of money has been claimed

to constitute duress, it is clear that the charge given was erroneous.

(2)     The second instruction gave the jury to understand that the paper which was signed by the plaintiff was a mere receipt and was of inferior force to a release under seal. The statute, Gen. Laws, cap. 202, § 12, has done away with the necessity of affixing a seal to a general or special release, and this reference to the law which had been abrogated was calculated to mislead the jury into giving the document less weight than it was entitled to. While not in form a release, it was more than a mere receipt. It was, in addition, an acknowledgment that the sum

(3) received was all that was due. The amount due having been in dispute, as all parties agree that it was, the offer and acceptance of the amount specified was binding upon both parties as a compromise. *Hull* v. *Johnson*, 22 R. I. 66. The receipt says in effect that it was so agreed upon, and can not be contradicted except on a proof of mistake, fraud, duress, or undue influence. *Small* v. *Sumner*, 6 Gray, 239; *Tanner* v. *Merrill*, 108 Mich. 58; *Rosenmueller* v. *Lampe*, 89 Ill. 212; *Ennis* v. *Pullman Car Co.*, 165 Ill. 161; *Lawrence* v. *Schuylkill Nav. Co.*, 4 Wash.C . C. 562; *Traux* v. *Miller*, 48 Minn. 62.

In *United States* v. *Child*, 12 Wall. 232, Mr. Justice Miller makes this comprehensive statement, which is conclusive of the question before us. He says: "We can hardly conceive of a definition of duress that would bring this case within its terms. Authorities. are cited to show that where, under peculiar circumstances, property is withheld from the owner and he is forced to pay some unjust demand to obtain possession of it, he can afterwards maintain a suit for the money so paid. But no case can be found, we apprehend, where a party who, without force or intimidation, and with a full knowledge of all the facts of the case, accepts on account of an unliquidated and controverted demand, a sum less than what he claims and believes to be due him, and agrees to accept that sum in full satisfaction, has been permitted to avoid his act on the ground that this is duress. If the principle contended for here be sound, no party can safely pay by way of compromise any sum less than what is claimed of him, for the compromise will be void

as obtained by duress. The common and generally praise-
worthy procedure by which business men every day sacrifice
part of claims which they believe to be just to secure payment
of the remainder would always be duress, and the compromise
void."

The defendant's exceptions to these instructions of the court
are sustained and the petition for a new trial is granted, and
the case will be remitted to the Common Pleas Division for
further proceedings.

*James C. Collins, Jr.*, for plaintiff.
*Cooke & Angell*, for defendant.