## HAZELHURST OIL MILL & FERTILIZER CO. v. UNITED STATES.
### Congressional No. 17453.

Court of Claims.
June 2, 1930.

This case having been heard by the Court of Claims, the court, upon the evidence adduced, makes the following special findings of fact:

1. On March 3, 1923, the Senate of the United States passed a resolution numbered 448, referring Senate bill numbered 4479, entitled "A bill for the relief of Rose City Cotton Oil Mill and others," to the Court of

Claims, under the provisions of the act of Congress of March 3, 1911, designated as the Judicial Code (see 28 USCA). Plaintiff is one of the two hundred and eighty-five claimants named in said bill. Copies of said resolution and said bill are attached to the petition as Exhibits 1 and 2 and made a part hereof by reference.

2. Plaintiff is a corporation and since 1897 has been engaged in the manufacture of derivative products of cottonseed.

3. On October 8, 1917, the President of the United States, acting under the authority conferred upon him by the Food and Fuel Control Act (40 Stat. 276) issued an Executive order or proclamation placing under license control of the United States Food Administration all dealers in cotton seed and manufacturers of cotton-seed products, including this plaintiff. Plaintiff subsequently applied for and received a license to operate its plant from the United States Food Administration, numbered G–3143, dated November 1, 1917, which provided that the same should be revoked upon the failure, neglect, or refusal of plaintiff to comply at all times with any and all orders, rules, and regulations of the said Food Administration. Plaintiff complied at all times with each and every one of said orders, rules, and regulations, and operated its plant under said license and by sufferance of said Food Administration. A copy of the Executive order or proclamation organizing the United States Food Administration is attached to the petition as Exhibit 4, and made a part hereof by reference.

4. On April 4, 1918, the War Industries Board, organized under the provisions of an act of Congress, formed a special section designated as the cotton-products section, to deal with linters, and appointed George R. James as chief of said section. On May 2, 1918, the said section fixed the price of all linters during the period from May 2, 1918, to July 31, 1919, at $0.0467 per pound f. o. b. point of shipment. The plaintiff was required during said period to cut a minimum of 145 pounds of linters from every ton of seed crushed. The plaintiff subsequently entered into a contract with the United States with respect to linters which it was to furnish to the government, and said contract established the price which was to be paid for linters.

5. After the outbreak of the World War and during the period prior to May 2, 1918, plaintiff produced and sold on the open market mattress and munition type linters, but during the period from May 2, 1918, to July 31, 1919, the plaintiff and the other cottonseed crushers produced and sold linters only to the Du Pont American Industries, Inc., sole purchasing agents of the United States. This was done in accordance with the terms and provisions of contracts in writing entered into between the plaintiff and the United States.

6. Prior to August 28, 1918, the Du Pont American Industries, Inc., acted as the sole purchasing agents of the United States, its allies and associates in the World War, under an informal agreement with the Ordnance Department of the United States Army. On said date, said informal agreement was reduced to writing, and said agents undertook for a consideration to purchase all linters produced in the United States during the period ending July 31, 1919, and did so purchase from plaintiff. A copy of the written agreement between the Du Pont American Industries, Inc., and the government of the United States is attached to the petition as Exhibit 6 and made a part hereof by reference.

7. On September 7, 1918, the United States Food Administration, acting for and on behalf of the government of the United States, issued its Circular No. 49, a copy of which is attached to the petition as Exhibit 8 and made a part hereof by reference. The said Food Administration fixed the price which plaintiff and all the other cotton-seed crushers were to pay for cotton seed; the price at which plaintiff and all the other cotton-seed crushers were to sell cotton-seed oil, cotton-seed meal, and cotton-seed hulls; the maximum freight allowance, the maximum operating cost per ton of seed crushed, and the maximum profit per ton of cotton seed crushed and converted, to apply for the season ending July 31, 1919. This schedule of prices fixed by the United States through its agencies, the Food Administration and the War Industries Board, and affecting the prices of cotton seed and the crushing of the same and the disposition of the products thereof, was known and spoken of as the stabilization scheme of the Food Administration. Plaintiff had no voice in fixing the price to be paid for the cotton seed, nor in the fixing of the price of derivative products, nor in the freight allowance, nor in the operating costs and profit. Plaintiff complied at all times with all of the provisions of said circular.

8. On or about September 28, 1918, the Du Pont American Industries, Inc., acting for and on behalf of the government of the

United States, sent to plaintiff a printed form of contract with directions to execute and return the same. Said contract covered the purchase of all linters then in possession of plaintiff and all linters to be produced by it during the season ending July 31, 1919, and named the price of $0.0467 per pound. Plaintiff protested as to the cancellation clause contained in the said contract to George R. James, chief of the cotton and cotton-products section of the War Industries Board. George R. James advised plaintiff to execute the contract as written, stating that he would attempt to have the cancellation clause therein stricken out in order to have the written contract conform with previous understanding. Plaintiff thereupon executed said contract, and carried out all the terms thereof and instructions of the government with reference thereto. The said James had no connection with the Ordnance Department, and had no authority to act for it, and was not a party to the contract. A copy of said contract is attached to the petition as Exhibit 7 and made a part hereof by reference.

9. Thereafter, on November 28, 1918, the plaintiff and all the other cottonseed-oil mills received a telegram from Mr. George R. James, chief of the cotton and cotton-linters section of the War Industries Board, after consultation with representatives of the Ordnance Department and Du Pont American Industries, Inc. Said telegram was in words and figures as follows:

"You are requested to notify all of your cottonseed-oil mills to discontinue the cutting of munition linters and to reduce the cut to 75 pounds or less at the earliest possible moment. When reduction in cut is begun, an accurate record of seed crushed and linters produced should be made and preserved pending definite and final arrangement for the discharging of all obligations of the Government linter pool to the mills and the removal of all rules and restrictions now in force. This request is made to avoid as much as possible an obvious economic waste, and is at the suggestion of officials of the Ordnance Department. It is hoped that a prompt and definite plan for the settlement can be offered in a few days."

Plaintiff complied with said request and thereafter produced only linters of the specified type.

10. At or about the time of said notice of November 28, 1918, plaintiff and the other cotton-seed crushers also received notice from the cotton and cotton products section of the War Industries Board, acting for the government of the United States, that definite and final arrangements for the discharge of all obligations of the government to the plaintiff and the other cotton-seed crushers would be made, and that a prompt and definite settlement would shortly be offered. After a conference with representatives of the government on December 10, 1918, a linter committee of the Interstate Cotton Seed Crushers' Association, acting for and on behalf of this plaintiff and the other cotton-seed crushers, submitted a final offer of settlement to the representatives of the government for the adjustment of the obligations of the government under the said contract, which offer of settlement provided that the United States would take up and pay for all linters on hand as of that date, and would also take up and pay for all linters to be produced thereafter to July 31, 1919, at a price which would net the producers $6.77 per ton of seed manufactured for the linters from such seed. Said offer was approved by the War Industries Board and the United States Food Administration. Copies of said offer and approvals are attached to the petition as Exhibits 9 and 10 and made a part hereof by reference. Said offer of compromise was rejected by the Ordnance Department, the other party to the contract.

11. On or about December 21, 1918, the War Industries Board ceased to function, and the linter committee, representing this plaintiff and the other cotton-seed crushers, was notified that all negotiations relative to the settlement of the obligations of the government under the said contract must in the future be carried on with the Ordnance Department of the United States. On December 30, 1918, a final conference was held regarding the adjustment and settlement of the obligations of the government to the cotton-seed crushers in Washington between the linter committee and the representatives of the Ordnance Department, and a final determination between the parties was arrived at.

12. On December 30, 1918, the officers representing the government in final conference with the linter committee notified the cotton-seed crushers and this plaintiff through said linter committee, that the government would settle its obligations to the cotton-seed crushers only by taking what linters were on hand, inspected, and tagged, amounting to about 270,000 bales, and would take only a part of the linters thereafter produced by the crushers from January 1, 1919, to July 31, 1919, not to exceed 150,000 bales, if so

much remained on hand unsold at that date; the amount taken to be prorated among the mills.

At said time said officials representing the government notified the cotton-seed crushers and this plaintiff that unless they accepted such offer above referred to within one hour from the time it was made, or by 7 o'clock p. m. of the same day, that the government of the United States would breach the contract of September 26, 1918, would refuse to accept or pay for any linters whatever, either those on hand, accepted, inspected, and tagged, or thereafter to be produced, and that plaintiff and other cotton-seed crushers could seek their remedy in the courts.

13. On December 30, 1918, at the time the government officials made a final statement to the linter committee of what they would do, there were numerous cotton-seed crushers, as well as bankers, farmers, and others interested in the cotton-seed crushing industry, present in Washington, awaiting the outcome of the conference with the officials of the government.

At 7 o'clock that evening the plaintiff and the other cotton-seed crushers, preserving their protest against the government's interpretation of the terms of the contract and the position taken by the government officials based thereon, notified the officials of the government that the cotton-seed crushers yielded to the demand of the government officials and would accede to the requirement of modification of "seller's contract of sale."

14. On December 31, 1918, plaintiff and the other cotton-seed crushers received notice from the Ordnance Department of the Army by telegram that the contract of September 26, 1918, was canceled. This telegram was in the following words and figures:

"Washington, D. C., Dec. 30, 1918.

"Your contract for linters with Du Pont American Industries, agent for United States Ordnance Department, is canceled. Your committee has tentatively agreed upon a form of settlement contract. Reply Major Hawkins, contract section, procurement division."

On January 2, 1919, the plaintiff and the other cotton-seed crushers received from the Du Pont American Industries, Inc., sole purchasing agents of the United States, a printed form of settlement contract embodying the verbal agreement between the representatives of the crushers and the Ordnance Department of December 30, 1918. Accompanying said printed contract was a copy of a letter written by the Ordnance Department to the Du Pont American Industries, Inc., stating inter alia that:

"8. If any producer declines to execute such instrument, the Ordnance Department will authorize you to decline to accept from such producer any linters whatever, and the United States will reimburse you for any proper expenditures and costs incurred or resulting by reason of such action on your part."

This letter, including the paragraph above quoted, was prepared by representatives of the government and counsel for the plaintiff and the other crushers acting jointly. Paragraph 8 was inserted at the request of and with the consent of the counsel for the crushers, who desired the same settlement to be made by all the crushers, so that none of the crushers would be in a position to get a more favorable settlement or settlements differing from those that the crushers would get who were represented by the crushers' committee and by its counsel. Under date of December 31, 1918, the plaintiff and defendant, by its agent, Du Pont American Industries, Inc., executed in writing a settlement contract, which is attached to the petition as Exhibit 11 and is made a part hereof by reference, and which recites inter alia the following preamble:

"Whereas the parties hereto entered into a contract, dated September 26, 1918, designated as seller's contract of sale, and being purchase contract No. 3143, for the purchase of cotton linters for use in the conduct of the war; and

"Whereas the conditions have changed since the execution of the said contract, which render it desirable that the same should be modified; and

"Whereas the buyer under said contract has served notice on the seller that the buyer would, on January 1, 1919, cancel said contract under the provisions contained therein relating to cancellation; and

"Whereas a dispute thereupon arose between the buyer and the seller as to the right of the buyer to cancel said contract, the said dispute growing out of the question as to whether or not the war has terminated; and

"Whereas a further dispute has arisen between the buyer and the seller as to what is the measure of damages provided by said contract for the loss, if any, to the seller, which would be caused by the cancellation of said contract; and

"Whereas contracts similar to the said contract have been entered into by the buyer

with practically all concerns engaged in the crushing of cottonseed and the production of linters, as more particularly appears in said contract; and

"Whereas it is for the best interests of the United States to arrange for a settlement of said disputes by a modification of said contract, under which modification the buyer will be required to receive and pay for a less quantity of linters than is provided for by the terms of the contract aforesaid.

"Now, therefore, in lieu of cancellation of said contract, and in consideration of the premises and the mutual agreements herein contained, the said parties have agreed, and by these presents do agree, with each other, to the following modification of the contract aforesaid."

Said contract provides for changes in the quantity of linters to be produced by plaintiff and purchased by the United States, and the prices to be paid therefor, and concludes with the following release to the Du Pont American Industries, Inc., the duly authorized agent of the United States:

"Upon the execution of this agreement, and upon compliance with its terms by the buyer, the seller releases the buyer from any and all claims or demands in law or in equity arising or growing out of any change, modification, or interruption in purchases, deliveries, and/or quantities of linters prescribed in the seller's contract of sale above referred to."

All the other cotton-seed crushers mentioned in Senate bill No. 4479 executed contracts as of the same date, of the same effect and import, and containing the foregoing provisions.

Said contract was approved and signed also by Col. R. P. Lamont, contracting officer, and by Hon. B. Crowell, Assistant Secretary of War. The following memorandum was, on January 2, 1919, signed, respectively, by Senator Benet, counsel for the plaintiff, and by Major Hawkins and Major Gelshenen:

"I am familiar with the settlement described under date of January 2, by R. P. Lamont, Colonel, Ordnance Department, regarding linters, and am able to state that this settlement is one which would be approved by Mr. B. M. Baruch, chairman of the War Industries Board, and by Mr. George R. James, chairman of the Linters Section, War Industries Board, both of whom are now out of the city and not expected to return for some time."

15. Plaintiff and the other cotton-seed crushers continued during the period from January 1, 1919, to May 31, 1919, to manufacture mattress-type linters in accordance with the terms of the settlement contract. No protest was, at any time, made by the plaintiff or any other crushers as to the signing of the settlement agreement of December 31, 1918, until after May 31, 1919, when an attempt was made before the Board of Contract Adjustment of the War Department to set aside the settlement agreement. On June 29, 1919, the plaintiff and the other crushers filed their claims with said board. The board denied the claimants relief. On appeal, the Secretary of War affirmed the action of the board.

16. The plaintiff produced from seed crushed during the period from January 1, 1919, to and including July 31, 1919, certain linters over and above those taken and paid for by the United States, and expended certain storage charges upon linters produced during said period, for which it has not been paid by the United States. The second contract dated December 31, 1918, did not provide that storage charges should be paid for by the United States, but, on the contrary, provided that "the seller, where it has space to do so, will store the same at buyer's risk and without charge for storage." The plaintiff crushed during the period January 1, 1919, to August 1, 1919, 7,632 tons of linters, for which it is entitled to $6.77 per ton, or $51,668.64. The plaintiff incurred expense for storage charges in the sum of $1,961.95; insurance, $367.25; handling, $109.50, by reason of the failure of defendant to accept and take linters in accordance with the original agreement. The United States paid the plaintiff the sum of $26,491.34, and the plaintiff received for linters sold to others the sum of $1,812.26, making in all the sum of $28,303.60. The amount paid the plaintiff was its proportional share under the contract of December 31, 1918. The amount unpaid is $25,803.74.

17. Plaintiff and the other cotton-seed crushers were under the orders and regulations of the Food Administration to maintain the price of cotton seed and cotton-seed products theretofore fixed by the Food Administration, and to continue the manufacture of such products for the entire crop year of 1918–19. The production of linters is a necessary part of the manufacturing process of extracting oil and other valuable contents from cotton seed. Linters cannot be bought by the crushers as a raw material,

but are purchased as a part of and attached to the cotton seed. The crushing of cotton seed is a seasonal business, due to the fact that seed will not keep, but owing to the high oil content, will, if kept in large quantities for any length of time, heat and spoil.

18. There are no claims, liquidated or unliquidated, existing in favor of the United States against plaintiff which the United States can set off or counterclaim against plaintiff, and there has been no delay or laches by plaintiff in presenting or prosecuting its claim, and the same is not barred by any statute of limitations; and the said claim is in amount and character the same, with respect to the Hazelhurst Oil Mill & Fertilizer Company, as that mentioned in Senate bill numbered 4479, entitled, "A bill for relief of Rose City Cotton Oil Mill and others," referred to this court by Resolution Numbered 448.

19. On December 30, 1918, the plaintiff had on hand 1,033 bales of munition linters made under government regulations, which had been inspected, accepted, and tagged by the Du Pont American Industries, Inc., agents of the United States, and which were unsalable except to the government having been specially cut, and being unsuited for ordinary commercial purposes. At the same time plaintiff had on hand 6,068 tons of cotton seed which it had bought under government regulations at $70 per ton; also 66,743 pounds of cotton-seed oil, 330 tons of cotton-seed meal, and 142 tons of cotton-seed hulls. The plaintiff was also committed to purchase from its agents, to which it had advanced funds, cotton seed to the value of $112,608, which cotton seed had been purchased by said agents at the fixed price of $70 per ton. Plaintiff was also obligated to individuals and banks in the total sum of $415,105.43, or about double the amount of its capital and surplus, which obligations it had incurred to finance the purchases above set forth and upon reliance on the government keeping its obligations. If defendant breached its contract for linters by not paying anything further thereon, as it threatened to do, the plaintiff and the other cotton-seed mills would have been unable to continue to pay $70 per ton for cotton seed, being the price fixed by the Food Administration, and the plaintiff was advised by the Food Administration that in that event it (the food administration) would not continue the stabilization plan and would not guarantee the price further. The result would have been a crisis in the market of cotton seed and its derivative products. The short-cut linters would have been unsalable and all other cotton-seed products greatly depressed in value, and plaintiff would have been caused a loss in the aggregate of about $200,000; its capital and surplus would have been consumed; it would have been unable to meet its obligations; it would have gone into bankruptcy and its business that had been built up in the course of twenty years would have been entirely lost; and plaintiff was induced to sign the settlement contract by fear of the consequences of a refusal, as above set forth.

20. The government, in accordance with the contract of September 26, 1918, paid for all of the munition linters produced by the plaintiff up to and including December 31, 1918, when the contract was terminated by mutual agreement and a settlement contract executed by the parties as hereinabove stated.

Christie Benet, of Columbus, S. C., and George A. King, of Washington, D. C. (George R. Shields, Wade H. Ellis, Challen B. Ellis, and Don F. Reed, all of Washington, D. C., Benet, Shand & McGowan, of Columbia, S. C., and Hatch & Reed, of Washington, D. C., on the brief), for plaintiff.

Alexander Holtzoff, of Washington, D. C., and Charles B. Rugg, Asst. Atty. Gen. (Herman J. Galloway, Asst. Atty. Gen., on the brief), for the United States.

Argued before BOOTH, Chief Justice, and GREEN, LITTLETON, and WILLIAMS, Judges.

GREEN, Judge.

The Hazelhurst Oil Mill & Fertilizer Company is one of 285 claimants whose claims are based on similar facts and which have been referred to this court by a Senate resolution. The findings show fully the proceedings which have taken place before the case came into this court. It is not necessary, however, that we should go into any details in relation thereto, for the reason that counsel for both parties to the action have agreed that the case may be submitted and judgment rendered as if it were an ordinary action commenced against the defendant, of which the court had general statutory jurisdiction. Accordingly, the case will be so treated, the claimant will be referred to in the opinion as the plaintiff and the government as the defendant, and we shall discuss in the opinion only such facts as will be necessary for the decision of the case.

Treating the case as an ordinary suit, we find it is one which is brought to recover dam-

ages alleged to have been sustained by reason of a breach of contract between plaintiff and defendant, under which contract the defendant agreed to purchase cotton linters of the plaintiff at a stated price. The defendant answers that all of the claims arising out of or under the contract, upon which suit is brought, were settled by a subsequent contract and agreement between plaintiff and defendant with which the defendant has fully complied. To this answer the plaintiff replies alleging that the contract of settlement is void, having been obtained through duress. These matters constitute the issues in the case.

■ In considering the facts of the case it will be observed that the findings contain no reference to federal statutes, presidential proclamations, and presidential orders which created the United States Food Administration and the War Industries Board for the reason that this court takes judicial notice thereof.

The original contract between plaintiff and defendant was made during the great World War and was subject to all of the authorized proceedings and regulations of the government made for the purpose of effectively carrying on and sustaining the part of the United States in that great conflict. With these preliminary statements we take up the facts upon which the decision of the court turns.

It appears without dispute that in 1918 plaintiff entered into a contract with the agents of the government of the United States for the production of cotton linters and their sale to the United States during the years 1918 and 1919. Linters are the short ends of staple cotton which adhere to the seed after the lint is taken off for the manufacture of cloth. They are the best known basis for nitrocellulose, which is used for the manufacture of high explosives.

In the spring of 1918 all cotton-seed oil mills of the United States were placed under the direct control of the United States Food Administration and the War Industries Board. This control was brought about by the action of the War Industries Board in fixing the price of all linters on hand on May 2, 1918, and to be produced thereafter during the period ending July 31, 1919, at $0.0467 per pound f. o. b. points of location or production, and at the same time requiring that all mills should thereafter produce a minimum of 145 pounds of linters per ton of seed crushed, as compared with a normal production of commercial linters in peace times of about 75 pounds of linters per ton of seed. When 75 pounds or less of linters are produced from a ton of cotton seed, the product is referred to as commercial linters, and when more than 75 pounds of linters are produced from a ton of cotton seed, they are called munition linters. Munition linters of 145 pounds cut have no value for commercial purposes.

As a part of this control, all mills were required to sell all linters produced during the season of 1918–19 to the Du Pont American Industries, Inc., sole purchasing agents of the United States, and were not allowed during said period to sell any linters to any other person whatsoever. Heavy penalties were prescribed for the failure to obey the orders of the government.

Another factor of this control was the action of the Food Administration whereby the prices of cotton seed and of all the derivative products thereof other than linters, the gross operating cost to the mills, the maximum freight allowance, and the profit to be made upon each ton of seed crushed during the period from August 1, 1918, to July 31, 1919, were fixed by governmental action. An operating license was required for each mill for the continuance of business which could be revoked on the failure of the licensee to comply with the orders and regulations of the Food Administration.

Under this concerted plan of governmental agencies, as above set forth, all mills were required to pay the farmers $70 per ton for every ton of cotton seed purchased during the said period ending July 31, 1919, which included all seed produced from the entire cotton crop of the South for the season 1918–19, and to sell all products derived from the crushing of cotton seed at the prices as fixed by the government.

Each of the mills subsequently received and executed a "Seller's Contract of Sale" containing the orders and regulations made in accordance with the above recitals, with which the mills complied, and by this contract the government was bound to purchase at a specified price from the mills all linters produced during the period above named. This contract contained a cancellation clause giving the government the option to terminate the contract "in the event of the termination of the present war." The contract was not terminated or canceled in accordance with the terms thereof nor was any settlement ever offered to the mills under its provisions.

On November 28, 1918, hostilities having been ceased by reason of the armistice of No-

vember 11, 1918, the government directed the mills to discontinue the manufacture of munition linters and revert to the manufacture of commercial linters, which the plaintiff and the other mills did at once. The government also notified all mills that a definite and final arrangement for discharging the obligations of the United States would be made in a few days. Numerous conferences were held between the linter committee, representing the plaintiff and the other mills, and the officials of the government with reference to the situation.

The cotton-products section of the War Industries Board ceased to function and was disbanded on December 21, 1918, and its activities with reference to linters were taken over by the Ordnance Department of the Army and the mills so notified.

On December 30, 1918, the Ordnance Department, acting through General Pierce, notified the mills, through the linter committee, that the government would take only the linters then held by the various mills, inspected and tagged, amounting to 270,000 bales, and would take only a part of the linters to be produced between January 1, 1919, and July 31, 1919, the amount to be taken at July 31, 1919, to be prorated among the mills, and unless the mills accepted this proposition as a settlement within one hour, by 7 p. m. of the same night, the United States would breach the contracts of September 26, 1918, and refuse to accept any linters whatever, either theretofore or thereafter produced.

The nature of the results that would have followed in the way of loss and damage if plaintiff refused to accede to the demands of the defendant, made through the Ordnance Department, is set out fully in finding 19.

Counsel for defendant strenuously contend that the testimony which was taken on behalf of plaintiff with reference to the results which would have followed a breach of defendant's contract in the manner threatened, is simply a guess, or at best merely the estimate of the witnesses who gave it, and is incompetent. The objection merits serious consideration; but after such consideration, we have concluded that it is not well taken. These witnesses were men of long experience in the business concerning which they testified and their competency as experts in the matters concerning which they gave testimony was fully established. As in all cases with expert witnesses, their testimony was simply their opinions in the matter based upon their experience and knowledge of the subject, and

the testimony cannot be excluded on that ground. Neither can it be rejected on the ground that it is not exact and at best, so far as the figures go, is only an approximation. The real objection to the evidence, if there be any, is that it is not given with reference to actual facts which are shown to have occurred, but with reference to what the witnesses in their judgment say would have occurred had the second contract not been entered into. No precedents can be found for our guidance in any exactly similar case, but we think the general principles with reference to expert and opinion testimony apply. If the evidence is received, and we think it should be, it is because it is the best that is obtainable upon the subject, or perhaps it might be said the only evidence that can be obtained. It would be idle to tell the plaintiff that proof should be produced of the injury which would result to it if defendant carried out its threats in order to make out a case of duress and then say that the only evidence that could be obtained in the way of proof was inadmissible. We have therefore used it in making up our findings. It may be somewhat inexact but it is not necessary that it should be exact in order to show the great amount of damage that plaintiff would have received.

It is urged on behalf of defendant that the plaintiff is precluded from any recovery by the language used in the opinion of the Supreme Court in the case of the Hartsville Oil Mill v. United States, 271 U. S. 43, 46 S. Ct. 389, 391, 70 L. Ed. 822, the plaintiff therein being a corporation which was in the same position as this plaintiff, but the language of the Supreme Court upon which the defendant relies we think was intended to apply only to the evidence in that case, which was far from being complete with reference to the extent of the plaintiff's injuries and the nature thereof.

In the Hartsville Case, supra, the Supreme Court, after severely criticizing the conduct of defendant's officials, said:

"Appellant must prove the probable injury which it would have suffered from the threatened refusal of the government to carry out its contract, and that fear of that loss was the effective cause of its executing the settlement contract. Any inference that the business of manufacturing and distributing cotton seed products would have been disastrously affected, would avail appellant nothing because it does not appear what the consequences to its own business and finances would have been.

"The findings establish that on December 30, 1918, there were in the hands of manufacturers 270,000 bales of linters; but it does not appear what proportion of them, if any, were in the hands of appellant. There is no finding with respect to the amount of cotton seed or cotton seed products in the hands of the manufacturers. There is no finding with respect to the nature or extent of the commitments of the manufacturers for the purchase of seed, or as to the nature or extent of the loss which appellant would have suffered if on December 30, 1918, the government had refused to go forward with its contract, or that the legal damages for such breach of contract would not have been adequate to compensate for its loss. There is no finding that appellant was induced to sign the settlement contract by fear of the consequences of a refusal to sign."

This want of evidence has now been supplied. There are findings as to the number of bales of linters in the hands of the plaintiff, and of the amount of cottonseed and cottonseed products that it had on hand. There is a finding with reference to the extent of its commitments for the purchase of seed, and as to the extent of the loss which plaintiff would have suffered if, on December 30, 1918, the government had refused to go any farther with its contract, and finally a finding that legal damages for such breach of contract would not have been adequate to compensate for its loss and that plaintiff was induced to sign the settlement contract by fear of the consequences of the refusal to sign.

Counsel for defendant cite cases which show that it has often been held that fear that financial loss will result if a threat is carried out is not sufficient by itself and alone to constitute duress, but in most of these cases it will be found that the threat which was made was simply to exercise some legal right and this, however serious the effect might be upon the other party, never constitutes duress. In the other cases where threats to perform some unlawful act have influenced the action of the other party, it still has not been held to be duress unless irreparable injury would follow the execution thereof. But in this case the threat was made not simply to cancel the contract so far as future operations were concerned but to refuse to pay for the linters which had already been tagged and accepted—a course of action for which the government cannot present even the shadow of a legal right. The government officials also must have known the effect of the course which the Food Administration proposed to take in event the settlement was not executed. Possibly the government officials who threatened to disregard the contract for the purchase of linters were not responsible for the acts of the Food Administration, but they knew of the effect their action would have upon the Food Administration and were proposing to take advantage of it. The situation with reference to prices of cotton seed, cotton-seed oil and meal, linters, and other derivative products in that era of rapid depreciation of values was like that of a row of tenpins—when one was knocked down, all the others fell with it. The findings show that if the plaintiff and the other mills had refused to accede to the demands of defendant's agents and they had carried out their threats, the result would have been a commercial crisis in the business of buying cotton seed and manufacturing various products therefrom.

If the prices of these products were not sustained by the government and all the mills were compelled to throw the accumulated products on the open market, values, as shown by the evidence, would have immediately collapsed, and the loss to plaintiff, as the findings show, would have been around $200,000—about the amount of its total capital and surplus.

If the loss on the linters had been all that would have resulted from the government breaching its contract, it could be properly said that plaintiff had a complete remedy at law in its suit to recover the price agreed upon in the original contract. But this was only a small part of the loss, and for the other losses which would have been sustained, as we have shown above, plaintiff had no legal remedy. It could not bring suit against the defendant to recover losses sustained by reason of the failure of the Food Administration to maintain the stabilization plan and for the depression in prices of all of the mill's products. It had no remedy except upon the linters. Above all it had no remedy for its bankruptcy and the loss of its business. As the findings show, its damage would have been irreparable.

█ We think these acts of the government officials constituted duress which would render the settlement void. If they did not, we are at a loss to know what would constitute duress outside of physical compulsion. In this view we think we are fully supported by the authorities. In Maxwell v. Griswold, 10 How. 242, 256, 13 L. Ed. 405, a government official had illegally assessed certain duties against imported goods, and the owner was

unable to obtain possession of the goods without making payment thereof, and the court said:

"The payment of the increased duties thus caused was wrongfully imposed on the importer, and was submitted to merely as a choice of evils. He was unwilling to pay either the excess of duties or the penalty, and must be considered, therefore, as forced into one or the other by the collector, colore officii, through the invalid and illegal course pursued in having the appraisal made of the value at the wrong period, however well meant may have been the views of the collector. The money was thus obtained by a moral duress, not justified by law, and which was not submitted to by the importer, except to regain possession of his property withheld from him on grounds manifestly wrong."

In Swift, etc., Co. v. United States, 111 U. S. 22, 28, 29, 4 S. Ct. 244, 247, 28 L. Ed. 341, it appeared that the plaintiffs were manufacturers of matches upon which revenue stamps were required, and were entitled to a commission from the government on account of making their own dies for the stamps so used, but the government refused to make payment of the amount due to them except in stamps, and the Supreme Court said with reference to the transaction:

"The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid, or other value parted with, under such pressure, has never been regarded as a voluntary act within the meaning of the maxim, volenti non fit injuria."

In support of the position taken, the court referred to numerous cases, saying:

"In Close v. Phipps, 7 Man. & G. 586, which was a case of money paid in excess of what was due in order to prevent a threatened sale of mortgaged property, Tindal, C. J., said: 'The interest of the plaintiff to prevent the sale, by submitting to the demand, was so great that it may well be said the payment was made under what the law calls a species of duress.' And in Parker v. Great Western Ry. Co., 7 Man. & G. 252, the wholesome principle was recognized that payments made to a common carrier, to induce it to do, what by law, without them, it was bound to do, was not voluntary, and might be recovered back. Illegal interest, paid as a condition to redeem a pawn, was

held in Astley v. Reynolds, 2 Strange, 915, to be a payment by compulsion. This case was followed, after a satisfactory review of the authorities in Tutt v. Ide, 3 Blatchf. 249 [Fed. Cas. No. 14,275b]; and in Ogden v. Maxwell, 3 Blatchf. 319, [Fed. Cas. No. 10,458], it was held that illegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back, on the ground that the payment was compulsory and not voluntary."

In Robertson v. Frank Bros. Co., 132 U. S. 17, 24, 10 S. Ct. 5, 7, 33 L. Ed. 236, customs duties collected in the threat of an onerous penalty were held to be involuntary, and the Supreme Court said:

"In our judgment, the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of that penalty might have been illegal, was sufficient to make the payment an involuntary one. It is true that the thing done under compulsion in this case was the insertion of the additional charges upon the entries and invoices; but that necessarily involved the payment of the increased duties caused thereby, and in effect amounts to the same thing as an involuntary payment."

We think the plaintiff has presented a stronger case than those referred to in the quotations from the opinions of the Supreme Court. The threatened action of the defendant's officers was not only illegal, but a more serious injury would result if the threat was carried out than in any of these cases and that injury would be irreparable.

The cases cited by the Supreme Court in the Hartsville Mill Case, supra, while sustaining the decision of the Supreme Court in that case are not, in our opinion, applicable to the facts shown in the case at bar. In Silliman v. United States, 101 U. S. 465, 470, 25 L. Ed. 987 (the case first cited), it appeared that the plaintiffs had leased some barges to the government, and the department informed plaintiffs that it would not comply with the provisions of the original contracts unless the plaintiffs would submit to material alterations against their interests and to the advantage of the government, and the Supreme Court said:

"The claimants could have sued for each instalment of rent as it became due, or when the government returned the barges they could have sued, as they now sue, for the whole amount due under the original charter-parties. They had a full and com-

plete remedy by suit against the government in the Court of Claims for the enforcement of their rights under those contracts."

In the case at bar we have held upon the facts that plaintiff did not have a full and complete remedy.

The reasonable limits of an opinion forbid our taking up the other cases cited in the Hartsville Mill Case, but in each and all of them the facts are readily distinguished from those in the case at bar and we can not think that the Supreme Court intended to hold that the facts now presented to this court would not constitute duress.

It may be argued that if the acts of the government officials were sufficient to constitute duress they also constituted tort, and that no suit can be brought against the defendant for torts committed by its officials whether authorized or unauthorized. We think the answer to this is plain. In the case at bar the acts of the government officials have been ratified by the government by insisting in this suit upon the benefits which accrued therefrom, but even so, if the cause of action was based upon a tort, it is probable that no relief could be granted. But the suit is not brought upon the tort but for a breach of the contract. The tort, if there was one, was merely an incident which caused the plaintiff to agree to the second contract and now entitles it to repudiate that agreement. The tort merely prevents defendant from maintaining its defense. The damages will not be measured by the tort. If they were so measured, they might include punitive as well as actual damages. The original contract is the yardstick for measuring the plaintiff's damages and the difference between what it would have received under that contract and what it actually did receive is the amount thereof.

The second contract being void, it is clear that the original contract was breached and the next question to be determined is the amount of plaintiff's damages.

[3] Plaintiff was paid for the linters produced up to January 1, 1919. The controversy in the case arises over those produced from that date to and including July 31, 1919, when the original contract ended. Assuming the original contract to be in full force, the findings show that from January 1, 1919, to August 1, 1919, the plaintiff crushed 7,632 tons of cotton seed for which

it was entitled to $6.77 per ton under the rules prescribed by the War Industries Board and the contract of sale made with the government purchasing agent. This amounts to $51,668.64. The government paid for linters produced during this period $26,491.34, and plaintiff also received from other parties for linters $1,812.26, or a total of $28,303.60. The plaintiff is entitled to recover the difference between the amount received and the price it was agreed to be paid in the original contract. In addition thereto, we think the plaintiff is entitled to recover storage, insurance charges, and handling charges as alleged in its petition. That the plaintiff incurred these costs is shown by the evidence. The second contract made no provision for payment of storage charges, but on the contrary provided that "the seller, where it has space to do so, will store the same at buyer's risk and without charge for storage." But we have held that the second contract was void and plaintiff was not bound by the terms thereof. The original contract made no provision for storage, insurance charges, etc., but it recited that the government had bought the linters f. o. b. cars at point of production, and we think there was an implied agreement that the government should take the linters as fast as they were produced. Probably this matter was not mentioned in the contract because under the war conditions that prevailed the cotton-seed mills could not produce linters fast enough to satisfy the government needs. The provision in the second contract was evidently intended to annul this implied agreement, but, like the remainder of the second contract, it was of no force and effect.

It will be observed in this connection that abstract equity is accomplished by the conclusions above stated. The government will pay only the amount which it would have paid under its original contract, plus some incidental charges which were probably caused by the government having ceased to have any use for linters and therefore permitting them to remain in the hands of plaintiff instead of taking them promptly as it may be presumed was done while the war continued. In other words, the government is simply required to carry out its original contract which, without the slightest excuse in law or equity, its officials violated.

Under the foregoing conclusions the plaintiff is entitled to recover $25,803.74, and judgment will be entered accordingly.