## PERKINS GINS v. UNITED STATES.
### No. 46759.

United States Court of Claims.

July 11, 1949.

Walter P. Armstrong, of Memphis, Tenn., for plaintiff.

Frank J. Keating, of Washington, D. C., with whom was H. G. Morison, Assistant Attorney General, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

This is a cotton linters case. It grows out of an alleged breach by the defendant of a contract of purchase during World War I of plaintiff's linters output for the 1918–19 season.

Suit was authorized under a special act of Congress approved March 31, 1945, 59 Stat. 693,[1] by the terms of which the statutes of limitation were waived.

Cotton linters are the short particles of lint—usually flaccid or fuzzy—that are left

---

[1] *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the statutes of limitation, so far as they bar the cotton linter claim of Perkins Gins, a corporation of Memphis, Tennessee, formerly the claim of Perkins Oil Company, also a corporation of Memphis, Tennessee, arising out of purchase contract numbered 3418, entered into by the said Perkins Oil Company, of Memphis, Tennessee, predecessor of said Perkins Gins, of Memphis, Tennessee, on September 16, 1918, with the United States of America be, and the same are hereby, waived and revoked.

Sec. 2. That the said claimant is hereby authorized to file within one year after the date of the enactment of this Act its said claim and have the same adjudicated by the Court of Claims of the United States.

attached to the seed during an ordinary ginning process. In ordinary times cottonseed oil mill operators run the seed through a second ginning process in order to secure the advantage of these linters, and in times of unusual demand specially treated knives or saws are used which cut the lint very close to the seed.

In the spring of 1918 all cottonseed oil mills including the Perkins Oil Company, were placed under the direct control of the Government of the United States through various agencies. The price of linters was fixed at $0.0467 per pound at points of location or production. The mills were required to remove 145 pounds of linters per ton of seed, whereas ordinarily the amount removed would be considerably less. In order to comply with this requirement plaintiff purchased and installed two new machines at a cost of $3,000. These machines were used for sharpening the gin saws, which had to be kept in much sharper condition than in cutting ordinary commercial linters. The contract was to apply for the season ending July 31, 1919.

The plaintiff corporation was paid for the amount of linters produced up to and including December 31, 1918. The suit involves the linters produced during the season after that date. The facts in this case are very similar to the facts in the case of Hazelhurst Oil Mill & Fertilizer Co. v. United States, 42 F.2d 331, 70 Ct.Cl. 334, and Farmers & Ginners Cotton Oil Co. v. United States, 76 Ct.Cl. 294, and other similar cases. The factual background is largely stipulated, and since the facts are so nearly identical with those in the cases cited, it is not necessary to discuss them in further detail.

With the exception of two points the legal questions are the same as in the cases cited. We will confine our discussion to these two points that are raised by the defendant.

Perkins Gins, the successor to Perkins Oil Company, sold its physical properties in 1922. Its records were sorted, indexed and stored in a storage room adjoining its office. About 1928 the records were destroyed by termites.

Plaintiff's only available record relating to the quantity of linters cut or seed crushed by the company between January 1 and July 31, 1919, was a copy of an audit of plaintiff's books and records for the fiscal year ending August 31, 1919.

■ Defendant contends that this audit should not have been admitted as evidence, and is not sufficient proof. We disagree.

This audit was one of a series which had been prepared annually for plaintiff by Homer K. Jones & Co., a firm of certified public accountants in Memphis, Tennessee. The two accountants who prepared the audit died prior to the time of the trial. A copy of the audit had been preserved in the files of Homer K. Jones & Co. and this copy was thoroughly identified as being a true copy, as having been in the possession of the accounting firm during the whole period, and as not having been changed. The testimony showed that the audit report was made in the regular course of business long before the inception of this litigation. The facts in the case and the testimony presented bring the copy clearly within the test of admissibility. 28 U.S.C. 695 [now 28 U.S.C.A. § 1732]; Burton v. Driggs, 20 Wall. 125, 22 L.Ed. 299; Bryce Plumbing & Heating Co. v. Maryland Casualty Co., D.C., 21 F.Supp. 854; Ulm v. Moore-McCormack Lines Inc., 2 Cir., 115 F.2d 492, certiorari denied 313 U.S. 567, 61 S.Ct. 941, 85 L.Ed. 1525.

The only other issue raised by the defendant is the question of the amount of the damages as shown by the record.

According to the Hazelhurst and the Farmers & Ginners cases, supra, the measure of plaintiff's damages is the tonnage of cottonseed crushed by plaintiff between January 1 and July 31, 1919, times $6.77 per ton. The court held this in these prior cases apparently because under the original contract plaintiff was required to produce 145 pounds of munition linters per each ton of cottonseed crushed and was to be paid for the linters at $0.0467 per pound; thus, in terms of tons of cottonseed crushed, the conversion figure is 145 times $0.0467.

Plaintiff operated the gin from September 15, 1918, to May 15, 1919, and had an audit report for the fiscal year ending August 31, 1919, covering these operations.

The audit showed that during this entire contract period plaintiff purchased and crushed 20,546.662 tons of cottonseed which produced 1,574,826 pounds of linters, and that these linters were sold for the total price of $98,576.01.

In order to find out how many tons of cottonseed out of the above total were purchased and crushed from January 1 to July 31, 1919, it is necessary to either (a) deduce this figure from the audit and other agreed figures in evidence or (b) to calculate the tonnage crushed based on the testimony of plaintiff's manager as to the number of days the gin operated and the amount crushed per day.

In paragraph 15 of the stipulation it was agreed that the Government paid plaintiff $40,281.50 for linters purchased by it up to January 1, 1919.

In paragraph 12 of the stipulation the parties agreed that plaintiff was bound under the Government contract to produce 145 pounds of linters per ton of cottonseed, and plaintiff's manager testified that plaintiff actually cut 145 pounds of linters per ton of cottonseed from September 15, 1918, to January 1, 1919.

Therefore, if $40,281.50 is divided by $0.0467, the Government paid the plaintiff for 862,558.88 pounds of linters up to January 1, 1919. Further, if it is assumed that plaintiff produced 145 pounds of munition linters per ton (and this assumption is not established by any documentary evidence), plaintiff crushed 5,948.68 tons of cottonseed up to January 1, 1919. By deducting this figure from the total tonnage of cottonseed as shown in the audit for the entire period, the remainder is 14,597.98 tons of cottonseed which was crushed from January 1 to July 31, 1919, and this is the method for which plaintiff contends. If these calculations were accepted in full, plaintiff would be entitled to recover $35,942.23.

As against the above, the Government's invoices (Defendant's Exhibits 1–13) show that the Government purchased only 755,436 pounds of linters from plaintiff up to January 1, 1919, and that it paid plaintiff for this figure only $35,278.84 as against the figure of $40,281.50 shown in paragraph 15 of the stipulation. The Government produced all of the invoices it had, but there is no proof either way to show that the invoices represented all of the Government purchases, except that the stipulated figure is higher.

The difficulty is that the plaintiff's figures can only be reached by a calculation based on the total crush for the 1918–19 season and the total amount of linters sold during the entire period.

We cannot allow recovery on this basis. We must limit the recovery to the amount which the evidence satisfactorily establishes as having been crushed after January 1, 1919.

The plaintiff's manager testified that from January 1 to May 15, 1919, the mill operated 115 days and crushed an average of 110 tons of cottonseed per day in producing mattress linters, making the total crush after January 1, 1919, of 12,650 tons. The other facts and circumstances in the record tend to support this figure.

In reading the entire record we are convinced that 12,650 tons represents all that the evidence satisfactorily establishes as having been crushed after January 1, 1919.

To adopt the plaintiff's figures would require a finding that plaintiff in all instances secured 145 pounds of linters per ton of seed crushed, and that it could have continued after January 1, 1919, to cut that amount by the slower, more tedious process of making munition linters at no greater operating cost than was involved in producing the lesser quantity of mattress linters. In the absence of positive proof we cannot assume such sinless perfection in operation notwithstanding some of the terms of the stipulation.

We adopt the figure of 12,650 tons as representing the crush after January 1, 1919, and in line with the facts set out in detail in finding 31, the plaintiffs R. G. Ashford and W. F. Houck, surviving officers and directors and trustees for the stockholders of Perkins Gins, are entitled to recover in the name of the plaintiff corporation by virtue of Section 3757 of the official Code of Tennessee of 1932, the sum of $23,572.57. It is so ordered.

HOWELL, MADDEN, WHITAKER and LITTLETON, Judges, concur.